**FOREST PROPERTIES, INC.(now known as RCK Properties, Inc.), Plaintiff–Appellant,**

**v.**

**UNITED STATES, Defendant–Appellee,**

**and**

**Big Bear Municipal Water District, Defendant–Appellee.**

**No. 97–5145.**

United States Court of Appeals, Federal Circuit.

May 19, 1999.

John H. Findley, of Sacramento, California, argued for plaintiff-appellant. With him on the brief were Ronald A. Zumbrun and Meriem L. Hubbard.

Andrew C. Mergen, Attorney, Environmental and Natural Resources Division, U.S. Department of Justice, of Washing-

ton, DC, argued for defendant-appellee, United States. With him on the brief were James F. Simon, Acting Assistant Attorney General, Edward J. Passarelli, Alan Brenner, and John A. Bryson, Attorneys.

W. Keith Lemieux, Lemieux & O'Neill, of Westlake Village, California, for defendant-appellee, Big Bear Municipal Water District.

Before LOURIE, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and RADER, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

This appeal challenges the Court of Federal Claims' decision that the United States did not take the appellant's real property when it denied the appellant a permit to dredge and fill certain underwater lake-bottom property. We agree that there was no taking and therefore affirm the judgment dismissing this suit for just compensation.

I

This case grows out of the planned residential development of two segments of property. The first segment is a 53 acre tract of upland contiguous to Big Bear Lake (the Lake) in Southern California. The second is 9.4 acres of lake-bottom contiguous to the aforementioned upland. The appellant Forest Properties, Inc. (Forest) and Big Bear Properties, Inc. (Big Bear) are, respectively, commonly-owned real estate development and real estate holding companies.

In 1969, Big Bear purchased 2500 acres of land adjoining the Lake for about $4 million. As part of the same contract, it also received a 20–year irrevocable option from a local water company to purchase up to 200 acres of lake-bottom land at $1,000 per acre. The option could be exercised only by an entity (Big Bear or a successor) that owned the land adjacent to the optioned lake-bottom land. As the lake was quite shallow, any use of it would require filling and/or dredging, and the water company had the right to approve any plans for doing so.

In the early 1980's, the number of acres subject to the option was reduced in the settlement of a dispute between Big Bear and the successor water district (the appellee Big Bear Municipal Water District) over the validity of the option. As part of the settlement, the water district approved Big Bear's tentative plan to fill and create housing sites on 9.4 acres of lake-bottom off of Eagle Point, a particularly scenic spot. The settlement also provided that "[t]he deed of the District conveying the Lake Bottom Land ... shall contain a reversionary clause under which title to [the lake-bottom] shall revert to the District if the proposed excavation and filling ... shall not be completed within three years after the date of said deed."

The 9.4 acres of lake-bottom were wetlands. The Federal Water Pollution Control Act Amendments of 1972 prohibited dredging and/or filling "navigable waters" without a permit obtained under Section 404 of those amendments. See Pub.L. No. 92–500, § 404, 86 Stat. 816 (1972) (codified at 33 U.S.C. § 1344). In the mid–1970's, the Army Corps of Engineers promulgated regulations defining "navigable waters" to include wetlands. See *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 139, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985) (validating the Corps' interpretation).

The Corps administers the Section 404 permit program, *see* 33 U.S.C. §§ 1344(a), (d) (1988), in accordance with guidelines developed in conjunction with the Environmental Protection Agency, *see id.* § 1344(b)—the Corps must make a "public interest review" of all permit applications,

*see* 33 C.F.R. § 320.4(a)(1) (1988). In relevant part, these guidelines provide that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a) (1988). A housing development is considered a non-water dependent project—one that "does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose." *Id.* § 230.10(a)(3). For such projects, the guidelines create two presumptions: (1) that "practicable alternatives that do not involve [wetlands] are presumed to be available, unless clearly demonstrated otherwise," and (2) that "all practicable alternatives ... which do not involve a discharge into [protected wetlands] are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise." *Id.* As a practical matter, this means that few, if any, dredge or fill permits will be granted for the construction of housing.

In March 1988, Big Bear applied to the local Corps office for a Section 404 permit for "a dredge and fill of approximately nine acres ... at Big Bear Lake in conjunction with a residential subdivision that will contain waterfront lots and a small marina. * * * A total of 62 acres (9 acres of filled area) will be developed with approximately 100 lots." The proposed fill would have created three peninsulas jutting out into the lake, and would have added numerous prime, lakefront lots to the development.

After filing the permit application, Big Bear, in May 1988, sold 53 acres of the uplands to Forest for $3.6 million. Five months later, in October 1988, Big Bear assigned to Forest the option to the 9.4 acres of lake-bottom, without additional payment. The owner of Forest and Big Bear stated that the $3.6 million was consideration for both the uplands and the option. Forest also took over the Section 404 permit application.

Forest exercised the option by entering into a contract to purchase from the water district the lake-bottom land. It also agreed with the water district to postpone the closing under the contract, thereby delaying the execution of the deed and avoiding the three year dredge-and-fill period established by the settlement agreement. By entering into the contract, Forest obtained equitable title to the lake-bottom land under the doctrine of equitable conversion. *See County of Santa Clara v. Curtner,* 245 Cal.App.2d 730, 54 Cal.Rptr. 257, 261 (Cal.Ct.App.1966).

In February 1989, however, the Corps told Forest that "[i]f we were asked for a final decision at this time with the information we currently possess, our recommendation to the District Engineer would be that the projects do not meet [the] criteria for permit issuance." Forest then modified its development to provide a "[r]evised [p]roject [that] involve[d] the creation of 123 lots on 57.6 acres of land including the planned 4.4 acres of net fill." These 4.4 acres had only one peninsula instead of three and the change apparently lessened the adverse effect of the development on the wetlands environment.

By 1991, this new, smaller development had secured the necessary state permits for the lake-bottom land. In February 1992, however, the Corps denied the permit. The Corps concluded that Forest's project could satisfy neither the Section 404 guidelines—mainly because Forest had not rebutted the presumption that there were available, less adverse "practicable alternatives to the proposed discharge"— nor the Corps' public interest review. As an alternative, the Corps suggested "a revised development proposal that would allow other possible uses of the Eagle Point property, such as higher-density lots on the available upland portions of the property."

Forest did not seek administrative or judicial review of the Corps' denial of the permit. It revised its development plan, however, to eliminate the filled peninsula and proceeded to develop the upland. Forest created 106 lots with a market price of about $12 million, at a cost of $7.1 million (the $3.6 million purchase price plus development costs). Forest has sold a number, but not all of the lots. Forest estimates that the additional lots on the proposed peninsula would have provided an additional profit of $2.36 million and claims that its equitable title to the lake-bottom now is worthless.

Forest filed the present suit in the Court of Federal Claims, seeking just compensation for the government's alleged taking of its property. It argued that the denial of the permit was a taking because it both deprived Forest of productive use of the lake-bottom land and would result in title to the lake-bottom land reverting to the water district. After a trial, the court held that there had been no taking and dismissed the complaint. In a 55–page opinion that discussed the issues in detail, the court held that because the regulation deprived Forest of only a small portion of the entire development and because the development as a whole was still profitable, "the economic impact of the regulation is not sufficiently severe to constitute a taking." *Forest Properties, Inc. v. United States*, 39 Fed.Cl. 56, 80 (1997).

## II

■ The determination whether the government's denial of a permit constituted a taking of Forest's real property, for which the Fifth Amendment mandates the payment of just compensation, involves three inquiries: (A) whether the taking alleged was physical or regulatory; (B) if the alleged taking was regulatory, what was the relevant parcel for determining the economic impact of the regulation, *see*

*Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1180 (Fed.Cir.1994); and (C) did the regulatory action actually constitute a taking, *see id.* at 1181–82.

■ A. A physical taking of land occurs when the government itself occupies the property or *"requires* the landowner to submit to physical occupation of its land," *Yee v. City of Escondido*, 503 U.S. 519, 527, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992), whether by the government or a third party, *see Preseault v. United States*, 100 F.3d 1525, 1551 (Fed.Cir.1996) (en banc). In a regulatory taking the government prevents the landowner from making a particular use of the property that otherwise would be permissible. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Such a taking may "den[y] all economically beneficial or productive use of land" (a "categorical" taking), *id.* at 1015, or have "crossed the line from a noncompensable 'mere diminution' to a compensable 'partial taking,'" *Florida Rock Indus. v. United States*, 18 F.3d 1560, 1570 (Fed.Cir.1994).

■ Here, as the Court of Federal Claims pointed out, "[t]here was neither a physical taking nor invasion of this property." The Corps' denial of the permit merely prevented Forest from making a particular use of the lake-bottom, namely, dredging and filling it and then developing building lots on the new dry land. That is a classic example of a regulatory taking claim.

This court without discussion twice has treated the same government action—denial of a permit under Section 404 of the Clean Water Act—as involving a claim for a regulatory taking. *See Loveladies Harbor*, 28 F.3d at 1173; *Florida Rock*, 18 F.3d at 1562.

Forest, however, contends that this case involves a physical taking because the ef-

fect of the denial of the permit will be the reversion to the water district of Forest's interest in the lake-bottom property, since the lake-bottom would not be excavated and filled within three years after execution of the deed to the property. This, however, would be attributable not to the government's action, but to the prior contractual arrangement between Forest and the water district for such a reversion. The government itself has not required Forest to give up or to submit to the physical occupation of the submerged land. *See Yee,* 503 U.S. at 527–28, 112 S.Ct. 1522.

Indeed, Forest's argument is abstract and conjectural. The reversionary period is triggered by the execution of the deed. As far as it appears from the record, the deed has not been executed and Forest continues to retain its equitable title to the submerged land. Unless and until Forest obtains the deed, the three-year period for dredging and filling the lake-bottom will not begin to run, and it cannot be said whether or when that will ever occur.

██ B. We also agree with the Court of Federal Claims that the relevant parcel for takings analysis is the entire 62 acre project. This relevant parcel inquiry is critical because "our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). *See also Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 130–31, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) ("In deciding whether a particular governmental action has effected a taking, this Court focuses ... on the nature and extent of the interference with rights in the parcel as a whole.").

██ With regard to the relevant parcel, "[o]ur precedent displays a flexible approach, designed to account for factual nuances." *Loveladies Harbor,* 28 F.3d at 1181. It requires courts to focus on the economic expectations of the claimant with regard to the property. *See Keystone,* 480 U.S. at 500–01, 107 S.Ct. 1232. Where the developer treats legally separate parcels as a single economic unit, together they may constitute the relevant parcel. *See id.; Naegele Outdoor Adver. v. City of Durham,* 844 F.2d 172, 176 (4th Cir.1988); *K & K Constr., Inc. v. Department of Natural Resources,* 456 Mich. 570, 575 N.W.2d 531, 535–37, *cert. denied,* —— U.S. ——, 119 S.Ct. 60, 142 L.Ed.2d 47 (1998).

The Court of Federal Claims found that the relevant parcel was the entire 62–acre project. In so finding, the court properly "ocus[ed] on how the economic expectations of the claimant, with respect to the parcel at issue, have shaped the owner's actual and projected use of the property."

The record shows that from the outset, the development was treated as a single integrated project (called Eagle Point Estates) comprising the two tracts. At the time Forest acquired its interest in the properties, it was understood that the two portions would be developed as a single project. As the trial court found, "from the time of the purchase of the upland property, [Forest's] economic intentions were to utilize the lakebottom acreage and the upland parcel in conjunction with each other as one income-producing unit." In fact, only the owner of the adjacent upland property could exercise the option on the lake-bottom land. The 1988 application for the Section 404 permit described a single project of "[a] total of 62 acres (9 acres of filled area) * * * developed with approximately 100 lots." After that application was filed, Forest purchased the 53 upland acres for $3.6 million and obtained the option on the submerged land without additional payment; the record indicates that the $3.6 million was the consideration for both parcels.

Forest points to other evidence in the record which, it contends, supports the use

of the 9.4 acres of submerged land as the relevant parcel for the taking analysis. It notes that it had different kinds of title to the lake-bottom (equitable ownership) and the dry land (fee), that it acquired its interest in the two entities in different transactions at different times, that different local government authorities had regulatory jurisdiction over the two locations, and that the two segments were capable of separate development. In holding that the entire 62 acre project was the relevant parcel, however, the Court of Federal Claims properly looked to the economic reality of the arrangements, which transcended these legalistic bright lines, and it did not commit clear error in so doing. *Cf. Loveladies Harbor*, 28 F.3d at 1181 (reviewing the relevant parcel determination for clear error).

■■■ C. The ultimate issue in this case is whether the Corps' denial of a permit to dredge and fill the 9.4 acres of lake bottom was a regulatory taking of the entire 62 acre parcel. "Several factors ... have particular significance" in the "essentially ad hoc, factual inquiries" that determine whether a government regulation constitutes a regulatory taking: (1) "The economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646. *See also Florida Rock*, 18 F.3d at 1564. In 1992, however, the Court in *Lucas* "dramatically change[d] the third criterion, from one in which courts, including federal courts, were called upon to make *ad hoc* balancing decisions, balancing private property rights against state regulatory policy, to one in which state property law, incorporating common law nuisance doctrine, controls." *Loveladies Harbor*, 28 F.3d at 1179. *See also Creppel v. United States*, 41 F.3d 627, 631 (Fed.Cir.1994).

Applying these factors, the Court of Federal Claims concluded:

Under the regulatory/partial taking analysis, the plaintiff is unable to demonstrate that there was any deficiency in the character of the Government's action, nor is the plaintiff able to demonstrate that it had reasonable, investment-backed expectations in the development of the lakebottom property in the manner in which it had proposed. Finally, there is substantial economic value remaining in the parcel as a whole, which supports the conclusion that the Government's denial of the plaintiff's permit only caused a noncompensable, mere diminution in the value of its property, which is not substantial enough to protect as a taking.

We discuss these factors in reverse order.

1. The character of the government action does not have an impact on this case. The Court of Federal Claims correctly found that the dredging and filling of the submerged area to permit its use for building would not constitute a nuisance under California law.

2. The trial court correctly held that the denial of the permit has not significantly "interfered with distinct investment-backed expectations." We have recognized that such expectations must be reasonable. *See 767 Third Ave. Associates v. United States*, 48 F.3d 1575, 1581 (Fed.Cir. 1995).

In 1988, when Forest purchased the 53 acres of upland and the option to acquire the 9.4 acres of lake-bottom from Big Bear, the Corps' guidelines governing the issuance of Section 404 permits under the Clean Water Act had been in effect for a number of years. As explained above, those guidelines made it clear that filling wetlands to construct housing on the reclaimed land was disfavored and that it was most unlikely that such a project would be approved. Indeed, three years before the Corps denied the permit, it told

Forest that on the basis of the information it then had, it would recommend denial. The investment-based expectation criterion "limits recovery to owners who can demonstrate that they bought their property in reliance on the non-existence of the challenged regulation. One who buys with knowledge of a restraint assumes the risk of economic loss." *Creppel,* 41 F.3d at 632. Although Forest unquestionably hoped to obtain the permit and realize its development goals, that hope is not enough to show a reasonable investment-backed expectation that might be protected by the Takings Clause.

■ 3. The "economic impact of the regulation upon the claimant" is "measured by the change, if any, in the fair market value caused by the regulatory imposition." *Florida Rock,* 18 F.3d at 1567. Forest, however, failed to introduce convincing evidence to show the amount, if any, by which the value of the relevant property—the 62 acres—was reduced by the denial of the permit.

Forest's evidence showed the listed selling prices for the developed upland lots, and the company's ultimate owner, Mr. Colburn, indicated that those prices were the fair market value of the land. There was also evidence showing the anticipated selling price of the lots that would be created by the draining and filling of the 9.4 underwater acres, and the profit on their sale that Forest allegedly lost through the denial of the permit.

Those prices, however, reflect the development of the lots following the denial of the permit, and do not necessarily reflect their value immediately after the permit was denied. This was not evidence of the amount by which the fair market value of the 62 acres was reduced by the denial of the permit. *See, e.g., Loveladies Harbor,* 28 F.3d at 1178. The profit that Forest allegedly lost does not necessarily reflect the reduction in market value the denial of the permit caused.

This case stands in sharp contrast to *Loveladies Harbor,* where the evidence led the Court of Federal Claims to find that the fair market value of the relevant parcel (there the submerged land) was $2,658,000 before the denial of the fill permit and only $12,500 after the denial—a diminution in value of 99%. *See id.* We held that "The trial court's conclusion that the permit denial was effectively a total taking of the property owner's interest in these acres is fully supported in the record: there is no clear error in that conclusion." *Id.* at 1182 (footnote omitted).

There are no comparable findings regarding the amount of the reduction in the fair market value of the relevant parcel here that resulted from the denial of the permit, and insufficient evidence in the record upon which such finding could be made. Forest had the burden of proof to establish a regulatory taking, and it failed to carry that burden. Indeed, the record shows that, despite the denial of the permit, the value of the 62 acres increased from the $3.6 million Forest paid in 1988 in what it asserts was an arms length transaction with Big Bear, to more than $12 million today. That result itself undermines Forest's contention that its property was taken. ·

In sum, we have no reason to disagree with the Court of Federal Claims' conclusion, grounded on the record, that the denial of the permit "did not prevent all or substantially all of the economically viable use of the property, and, thus, the economic impact of the regulation is not sufficiently severe to constitute a taking."

## CONCLUSION

The judgment of the Court of Federal Claims is

*AFFIRMED.*