**LOST TREE VILLAGE CORPORATION,**
Plaintiff,

v.

**UNITED STATES, Defendant.**

No. 08–117C.

United States Court of Federal Claims.

Filed Under Seal: May 21, 2010.

Reissued: May 27, 2010.

Jerry Stouck, Greenberg Traurig, LLP, Washington, D.C., for plaintiff. With him on the briefs was Maggie Sklar, Greenberg Traurig, LLP, Washington, D.C.

James D. Gette, Trial Attorney, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Ignacia S. Moreno, Assistant Attorney General, Environment & Natural Resources Division, and Brook B. Andrews, Attorney, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C. Of counsel was John Kasbar, Assistant District Counsel, United States Army Corps of Engineers, Jacksonville, Florida.

## OPINION AND ORDER[1]

LETTOW, Judge.

This action concerns a 4.99 acre tract of land, most of which is a wetland, known as "Plat 57," bordering a cove on the Indian River near the Atlantic Ocean in east central Florida. Plaintiff, Lost Tree Village Corporation ("Lost Tree"), sought a wetlands fill permit for Plat 57, which the U.S. Army Corps of Engineers ("Corps") denied on August 9, 2004. Lost Tree claims that the denial of its permit application eliminated all

---

1. Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this decision and to provide proposed redactions of any confidential or proprietary information on or before May 27, 2010. No redactions were requested.

economically viable use of Plat 57 and constituted a taking in contravention of the Takings Clause of the Fifth Amendment. Early in the parties' steps to prepare this regulatory takings case for resolution, they recognized that the key issue centers on defining the relevant parcel of property. To address that salient aspect of the case, Lost Tree has filed a motion for partial summary judgment respecting the proper parcel or parcels of land to be considered in the takings analysis, and the government has responded with a cross-motion on that issue.

Acknowledging that the proper-parcel issue is highly fact-dependent, the parties have submitted extensive joint stipulations of fact accompanied by voluminous documentary exhibits.[2] Accordingly, the question before the court is whether the detailed factual stipulations provide a sufficient background to decide the proper-parcel issue. A hearing on the cross-motions was held on March 25, 2010, during which the court received a detailed explanation of maps and plats that had been included in the parties' submissions. At this juncture, the disputed issue has been submitted for decision on a paper record; the court has neither heard testimony nor visited the pertinent lands.

## BACKGROUND[3]

Formed in 1956 as a Florida corporation, Lost Tree was for a considerable period of time a land-development enterprise. Stip. ¶¶ 1–2. During the 1960s, Lost Tree developed Lost Tree Village, a residential community on approximately 450 acres located east of North Palm Beach, Florida. Stip. ¶ 3.

### A. Land Acquisition

In 1968, Lost Tree shifted its development northward and entered into an option agreement (the "1968 Option Agreement" or "Option Agreement") with the descendants of Fred R. Tuerk to purchase approximately 2,750 acres of property on the mid-Atlantic

coast of Florida in Indian River County, near Vero Beach. Stip. ¶¶ 7–8, Ex. A (1968 Option Agreement (Oct. 8, 1968)). The lands subject to the 1968 Option Agreement were located in the general area of the Town of Indian River Shores and relatively near the City of Vero Beach, and were comprised of various parcels, many of which were not contiguous to the largest tract. The Option Agreement covered (1) land on an unnamed barrier island ("Barrier Island") on the Atlantic coast, which island is bisected by U.S. Highway A–1–A, (2) a westerly peninsula of the Barrier Island known as the "Island of John's Island" bordering the Indian River, (3) various other islands in the Indian River, including Gem Island, and (4) upland tracts bordering and near the Indian River, as well as submerged lands. Stip. ¶ 9.[4] The Option Agreement separated the parcels into nine separate conveyances, Conveyances "A" through "I," allowing for the purchases of the property through the exercise of the various options. Stip. Ex. A at LTVC015324 (1968 Option Agreement).

In February 1969, Lost Tree exercised the first of what would be six options pursuant to the 1968 Option Agreement. Stip. ¶ 12. That option covered conveyances "A" and "B" which were located on both sides of U.S. Highway A–1–A on the Barrier Island immediately adjacent to the Atlantic Ocean. Stip. ¶ 21; Plaintiff's Proposed Findings of Uncontroverted Fact ("PFUF") ¶ 21. Between November 1971 and August 1974, Lost Tree exercised options five additional times to acquire the remaining property covered by the 1968 Option Agreement. Stip. ¶ 13. The five additional transactions are reflected in a series of deeds recorded in the Official Books of the office of the Clerk of the Circuit Court of Indian River County, Florida which bear the following dates: February 5, 1970; November 5, 1971 (corrected December 6, 1971 and January 10, 1972); September 7, 1972;

---

2. The Joint Stipulations will be cited as "Stip. ¶ ___."

3. The recitations that follow do not constitute findings of fact. Instead, the recited factual elements are taken from the parties' stipulations of fact and other filings and are undisputed except where a contrary indication is noted.

4. These upland tracts included approximately 35 acres located about five miles west of Gem Island (the "West Acreage"), Stip. ¶ 9, and 10 acres located about one quarter mile to the north (the "North Acreage"). Stip. ¶ 11.

September 7, 1973; and August 12, 1974. Stip. ¶¶ 12–13. The last exercised option related to so-called Conveyance "C" and encompassed a significant portion of the Island of John's Island, including Plat 57, the tract involved in the permit denial engendering Lost Tree's takings claim, Stip. ¶ 14, and Conveyance "D" which concerned Gem Island. Stip. ¶ 28.

### B. Development of the Community of John's Island

Although the 1968 Option Agreement mentions a "tentative land development plan depicting the Optionee's proposed development of all of the land that extends from the Indian River to the Atlantic Ocean plus the lands comprising John's Island," Stip. Ex. A at LTVC015300, no overall development plan for the various properties involved with the 1968 Option Agreement has been found. Stip. ¶ 17. Beginning in 1969, and continuing until roughly the mid–1990s, a span of approximately 25 years, roughly half of the 2,750 acres covered by the 1968 Option Agreement was developed on a segmented basis involving many separate plats into what ultimately became a gated residential community known as "John's Island," Stip. ¶ 18, although most knowledgeable people in the vicinity would consider that the community of John's Island includes parcels which were neither covered by the 1968 Option Agreement nor ever owned by Lost Tree. Stip. ¶¶ 19–20.

The first property Lost Tree developed was that covered by Conveyances "A" and "B" on the Barrier Island, purchased in February 1969 in the first of the six options. Stip. ¶ 21. The initial development on the Barrier Island was platted with the Town of Indian River Shores in March 1969 as "John's Island Plat 1," and consisted of the South Golf Course, condominiums, golf cottages, and homes in the vicinity of the South Golf Course. Stip. ¶ 23. Lost Tree also developed the infrastructure for the Barrier Island property, including streets, utilities, sewage systems, and a sewage treatment facility. Stip. ¶ 22. Lost Tree's development of the Barrier Island continued until the mid–1980s, and eventually included two golf courses located west of Highway A–1–A (Lost Tree built a second golf course in 1970), a beach club on the Atlantic Coast, golf cottages, a private hotel facility, and about 800 individual dwelling units. Stip. ¶ 24. In the course of its development of the Barrier Island, Lost Tree recorded approximately 45 different plats on the Barrier Island. Stip. ¶ 25. The plats covered proposed homesite or condominium "lots" as well as other adjacent property such as wetlands or submerged lands, generally either referred to as "tracts" or as conservation easements. Stip. ¶ 27.

Beginning in the late 1970s, Lost Tree embarked upon the development of what was then a peninsula on the Barrier Island jutting westward into the Indian River, known as the Island of John's Island,[5] and Gem Island located northwest of the Barrier Island and north of the peninsula. Stip. ¶¶ 28, 31. These properties were purchased by Lost Tree in the last of the six options executed on August 12, 1974. *Id.* The first plat for the development of home sites on the Island of John's Island was Plat 25, filed with the Town of Indian River Shores in May 1980 and replatted in 1982. Stip. ¶ 33. In August 1980, Lost Tree submitted an application (the "1980 Permit Application") to the Corps for a permit under Section 404 of the Clean Water Act, 33 U.S.C. § 1344, and a comparable permit application to the State of Florida's Department of Environmental Regulation. Stip. ¶¶ 44–45.[6] In conjunction with the 1980 Permit Application, Lost Tree submitted a "Development Plan" for the Island of John's Island and Gem Island, Stip. ¶ 34, which included several project drawings. Stip. ¶ 35. The 1980 Development Plan "pro-

---

5. The so-called "Island of John's Island" was connected to the Barrier Island by an isthmus until action was taken in the early 1980s to breach the isthmus with a canal that improved water flow and eliminated stagnant, eutrophic water. *See infra,* at 714 & n. 8.

6. Florida's Department of Environmental Regulation was in existence from the mid–1970s to the mid–1990s and had responsibility for environmental regulatory activities in the State. It merged with the Florida Department of Natural Resources to form the Florida Department of Environmental Protection.

pose[d] the creation of some 200 single family residences on about 400 acres of land[,] ... 90% in existing upland areas requiring no governmental regulatory agency permitting," and the "[p]rotection of some 35.37 acres of existing mangrove islands ... as per John's Island Preservation Society agreement." Stip. Ex. G at LTVCOS0052 (1980 Development Plan). On one of the project drawings, much of Plat 57 was shaded in green and labeled "wildlife preserve." Stip. ¶ 35. No agreement between the entity described as the John's Island Preservation Society and Lost Tree has been found, Stip. ¶ 42, and it appears that the Preservation Society was never formed.

In the 1980 Permit Application, Lost Tree sought approval for various infrastructure improvements, including installation of two causeways, one connecting the existing development on the Barrier Island to the Island of John's Island and the other connecting the Island of John's Island to Gem Island. Stip. ¶¶ 43, 47. The Application also addressed construction of several canals including a U-shaped canal that would be located at the southwesterly portion of the Island of John's Island near Chambers Cove, an arm of the Indian River which borders Plat 57, and roughly trace the edge of Stingaree Point and Horse's Head, two small peninsulas extending into the Indian River from the Island of John's Island, and placement of fill in various wetlands to facilitate residential development. Stip. ¶ 43. Although the Corps had determined by the Spring of 1982 that it was prepared to issue a permit for the work envisioned in the 1980 Permit Application, the Corps never acted on the permit application because the State would not approve its

version of the 1980 Permit Application without modification. Stip. ¶¶ 49–53.

On August 2, 1982, Lost Tree submitted a revised proposal to the Corps, followed by additional revised plans to the State on October 1, 1982. Stip. ¶¶ 54–55. The new application deleted "all originally proposed project features ... from th[e] application except the bridge from [the Island of] John[']s [Island] to Gem Island and its approaches." Stip. ¶ 55 (quoting Stip. Ex. K at ID00485 (Modification of Dredge and Fill Application (Oct. 1, 1982))). On December 7, 1982, the Corps issued a permit to Lost Tree which approved only the following infrastructure improvements: (1) construction of a causeway connecting the Barrier Island to the Island of John's Island; [7] (2) installation of a canal which physically separated the peninsula of the Island of John's Island from the Barrier Island, making the Island of John's Island a separate island; and (3) removal of an earthen plug at the southern tip of the Island of John's Island to allow water to flow from John's Island Sound into the Indian River. Stip. ¶¶ 56–57; Stip. Ex. K at ID00417–442 (1982 Permit (Dec. 7, 1982)).[8]

On July 8, 1983, Lost Tree submitted another Clean Water Act Section 404 permit to the Corps and a corresponding application to State. Stip. ¶¶ 61–62. These applications sought approval to install a causeway and bridge connecting the Island of John's Island with Gem Island. Stip. ¶ 64. The Corps approved the application in November 1984. Stip. Ex. L at ID00831–850 (1984 Permit (Nov. 27, 1984)).[9]

Jutting off the southern end of the Island of John's Island on the west side is a small peninsula known as "Stingaree Point." Stip.

---

7. This causeway is known as the "Sandpiper Causeway," and its purpose was to "provide[] access from the main part of [the community of] John's Island [on the Barrier Island] to the [Island of John's Island] without having to go outside the community," allowing homeowners on the Island of John's Island, for example, to "drive to the ... golf club without having to [go] outside the [gated] community." Stip. ¶ 70 (internal quotation marks omitted).

8. John's Island Sound is located between the Island of John's Island and the Barrier Island, see PFUF Ex. BB at ID00314 (map), and the

canal breached the isthmus that had connected the Island of John's Island with the Barrier Island.

9. Nine years later, in 1993, Lost Tree applied for and received a third permit from the Corps for the construction of a second canal, on the north end of the Island of John's Island, near the Gem Island bridge proposed by the 1984 Permit Application. Stip. ¶ 67. This canal, the Gem Island causeway and bridge, and Gem Island have only a peripheral relevance to the proper-parcel issue currently before the court.

¶ 30. Plat 57 is located on the north side of Stingaree Point. *Id.* Lost Tree began developing the south side of Stingaree Point in November 1985 when it recorded Plat 40, comprised of six lots on the south and east sides of Stingaree Point. Stip. ¶ 71. Within a few years, these lots had been sold and homes were built on them. *Id.* Access to the six lots on Stingaree Point was provided by a new road constructed roughly up the center line of the Point, called Stingaree Point Road. Stip. ¶ 97. None of the improvements authorized by the 1982 permit were necessary for the construction of Stingaree Point Road or development of the six lots comprising Plat 40. Stip. ¶ 72. At that time, the north side of Stingaree Point, on which Plat 57 is located, was left unplatted. Stip. ¶¶ 71, 110. Lost Tree installed water and sewer lines and "stubbed out" the lines to the six lots comprising Plat 40, but Lost Tree did not stub out such services to the then unplatted area that ultimately became Plat 57. Stip. ¶¶ 102–103. In contrast, Lost Tree did stub out water and sewer service to a tract at the southeastern end of Stingaree Point, which tract eventually became Plat 55. Stip. ¶ 103 An appraisal dated April 30, 1986 stated that the "development [of Stingaree Point] is substantially completed, with the exception of the entrance area, landscaping and a final layer of asphalt on the road." Stip. Ex. N at LTVC013533 (John's Island Remaining Real Estate and Related Assets (Apr. 30, 1986)) (evaluating budget to complete development of the Island of John's Island). The appraisal did not consider the area that later became Plat 57 for development.

In 1989, Lost Tree recorded Plat 52, which covered all 40 lots on Gem Island. Stip. ¶ 75. Lost Tree began selling the Gem Island lots to individuals for single family residences in 1990. *Id.* In October 1995, Lost Tree sold the remaining lots on Gem Island to Gem Island Investment LP, an entity owned by some individuals who held interests in Lost Tree. *See* Stip. ¶¶ 4, 76. By 1999, Gem Is-

land Investment LP had sold the remaining Gem Island lots. Stip. ¶ 76. At that time, late in the 1990s, the development of the community of John's Island was substantially complete. Stip. ¶¶ 77–79. Lost Tree had developed and sold approximately 1,380 single-family homesites and condominium units since 1969. Stip. ¶ 78.

### C. Termination of Developmental Operations and Disposition of Scattered Parcels and Islands

As development of the community of John's Island neared completion in the mid–1990s the focus of Lost Tree's business changed from real-estate development to management of a portfolio of assets that included some real estate. Stip. ¶ 80. Marking this shift, Lost Tree hired a new company president in 1994, Charles M. Bayer, who became responsible for managing Lost Tree's investment portfolio. Stip. ¶ 81. In 1995, Lost Tree changed its federal income tax status to reflect that it was no longer a land developer, and from 1996 onwards it was taxed as a company not in the business of selling real property. PFUF, Attach. 1 (Decl. of Charles M. Bayer (Dec. 17, 2009) ("Bayer Decl.") ¶ 19).[10] In addition to managing Lost Tree's investment portfolio, Mr. Bayer became responsible for addressing the remaining property Lost Tree owned in Indian River County, which principally consisted of the following parcels: (1) the "West Acreage"; (2) the so-called "Lost Tree Islands," in total comprising approximately 500 acres located on scattered islands in the intercoastal waterway; and (3) the "North Acreage." Stip. ¶ 83. Lost Tree also still owned a few small parcels on the Island of John's Island. Stip. ¶ 87. On July 11, 2001, various parcels of properties derived from the 1968 Option Agreement were reserved as conservation easements by deed restrictions recorded by Lost Tree in favor of the St. John's River Water Management District ("SJRWMD"). PFUF ¶ 92A; Bayer Decl. ¶ 23. These par-

---

**10.** "Prior to 1996, in accordance with [S]ection 262(a) of the Internal Revenue Code, Lost Tree had capitalized infrastructure costs, employee and office overhead, and other development costs that benefitted multiple lots and added an allocated share of those costs to the tax basis of property Lost Tree sold." Bayer Decl. ¶ 19.

Subsequent to its change of business purpose, Lost Tree treated its operational costs as an expense, which would not have been permissible for a company in the business of developing and selling real property. *Id.* After an audit, the Internal Revenue Service accepted this change in accounting treatment. *Id.*

cels included all of Hole in the Wall Island, three large islands in John's Island Sound, and parcels north and south of the Gem Island causeway. PFUF ¶ 92A; *see also* Stip. ¶ 104. Lost Tree also addressed other property obtained under the 1968 Option Agreement by recording conservation easements in deed restrictions in favor of the federal government, *i.e.*, the Corps, the State of Florida, *i.e.*, the Department of Environmental Protection and SJRWMD, Indian River County, the City of Vero Beach, and the Town of Indian River Shores. PFUF ¶ 92A.

Of the residual parcels Lost Tree still owned on the Island of John's Island, Lost Tree determined that two were developable. Stip. ¶ 87. The first parcel, comprising three lots near the southeastern-most base of Stingaree Point, was recorded as Plat 55 in 1998 and subsequently developed into homesites. Stip. ¶ 88. These three lots were located on upland and no Corps permit was required. *Id.* The second parcel, also consisting of three lots, was located on the small peninsula called Horse's Head, and Lost Tree submitted a Section 404 wetlands fill permit application for this property in July 1997. Stip. ¶ 89. While the permit application was still pending, Lost Tree sold the Horse's Head property to Horse's Head Ltd., a separate entity with a different ownership structure than Lost Tree, which ultimately received a wetlands fill permit from the Corps in 2002. Stip. ¶¶ 91–93. The Horse's Head property was recorded as Plat 54. Stip. ¶ 93.

Subsequently, the so-called "Lost Tree Islands" were sold pursuant to a settlement agreement with the City of Vero Beach and the Town of Indian River Shores, which settlement stemmed from claims Lost Tree had asserted against the City and Town for changing zoning requirements to prohibit road access to those islands. Stip. ¶ 85; *see Lost Tree Village Corp. v. City of Vero Beach*, 838 So.2d 561 (Fla.Dist.Ct.App. 2002).[11]

### D. *Advent of Plat 57*

In 2001 and 2002, apart from the dispositions by sales or grants of conservation easements described above, Lost Tree considered whether Plat 57 constituted a developable site. Stip. ¶¶ 104–105. Plat 57 is a 4.99 acre parcel of land located on the north side of Stingaree Point, Stip. ¶ 98, described by the parties as "a mangrove swamp and wetlands that have been disturbed by scattered upland soil mounds vegetated by an invasive species of pepper, and by manmade ditches installed for mosquito control." Stip. ¶ 99. The water present is eutrophic, *i.e.*, rich in nutrients but starved of oxygen, and thus will support only limited flora and fauna. Bayer Decl. ¶ 37. In 2002, Mr. Bayer recommended that Lost Tree develop Plat 57. Stip. ¶ 107. On August 2, 2002, Lost Tree filed an application with the Town of Indian River Shores requesting approval for a preliminary plat and a marginal wetlands determination and conditional use authority for 2.13 acres of wetlands that would need to be filled for the development of one residential lot on the property. Stip. ¶ 110. Lost Tree submitted a Section 404 wetlands fill permit application to the Corps for Plat 57 later that month, on August 23, 2002. Stip. ¶ 111. The Town of Indian River Shores approved a preliminary plat for Plat 57 that would allow for one residential homesite. Stip. ¶ 115. However, this approval was challenged in Florida circuit court by King Stubbs and Dace Brown Stubbs on the grounds that the wetlands Lost Tree sought to fill were not marginal wetlands. Stip. ¶ 116. Lost Tree intervened in the suit as a third-party defendant, and after a three-day bench trial, in February 2004, the court upheld the Town's approvals for Plat 57 as consistent with the Town's Comprehensive Plan and found that the Town's determination that the wetlands were marginal was supported by substantial evidence. *Id.* On June 28, 2004, Lost Tree submitted additional information to the Corps in support of its permit application. Stip. ¶ 118. On August 9, 2004, the Corps denied that application. Stip. Ex. U (Plat 57 Decision Document (Aug. 9, 2004)).

---

11. The West Acreage was sold to an unrelated developer in 2004, together with some property contiguous to that acreage that Lost Tree had acquired in the 1980s not pursuant to the 1968 Option Agreement. Stip. ¶ 86.

### E. The John's Island Property Owners Association

Today, the gated community of John's Island has a homeowners' association known as the John's Island Property Owners Association or "JIPOA," to which over 90% of the homeowners in the community belong. Stip. ¶ 124. As the community of John's Island was being developed, several different homeowners' associations were formed on the Barrier Island, Island of John's Island, and Gem Island, most if not all of which eventually merged into JIPOA. Stip. ¶ 125. JIPOA provides security services, maintenance of common areas, and architectural review of the properties of its members, but owners in the community who are not members of JIPOA are not subject to this architectural review nor are these owners subject to payment of JIPOA's dues or its rules. Stip. ¶ 126. JIPOA is not affiliated with Lost Tree. The golf club within the community of John's Island, "John's Island Club," runs the two golf courses within the community, as well as a third golf course located approximately ten miles from the main club house in the community. Stip. ¶ 137. The golf club is neither controlled by nor affiliated with Lost Tree. Stip. ¶¶ 138–139. Membership in the John's Island Club and the affiliated beach club is and always has been detached from property ownership in the community of John's Island, requiring separate application to and acceptance by the membership committee of the Club. Stip. ¶ 138. As a result, not all of the residents of the John's Island community are members of the John's Island Club and not all club members are residents of the community. Id.

### STANDARDS FOR DECISION

Summary judgment is appropriate if the record demonstrates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" if it "may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250, 106 S.Ct. 2505. A fact is "material" if it might affect the outcome of the case. Id. at 248, 106 S.Ct. 2505. When deciding these issues, courts view all inferences in the light most favorable to the non-moving party. Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In disposing of cross-motions for summary judgment, courts evaluate each motion on its own merits and resolve any reasonable inferences against the moving party. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390–91 (Fed. Cir.1987). Denial of both motions is warranted if genuine disputes exist over material facts. Id.

In addressing Lost Tree's regulatory takings claim, the court among other things must determine whether the Corps' permit denial precludes all economically viable use of the property, amounting to a categorical taking. See Palm Beach Isles Assocs. v. United States, 208 F.3d 1374, 1380 (Fed.Cir. 2000). This determination frequently depends on how the relevant parcel is defined. Id. The resulting relevant-parcel issue is often referred to as the "denominator problem" because, "in comparing the value that has been taken from the property by the imposition with the value that remains in the property, 'one of the critical questions is determining how to define the unit of property whose value is to furnish the denominator of the fraction.'" Id. at n. 4 (quoting Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987)). The court's determination respecting the relevant parcel is "a conclusion of law, based on the facts of the case." Id. at 1380. Courts have rejected a brightline rule that the relevant parcel, the so-called "denominator" of the takings fraction, is limited to that parcel for which the owner seeks a permit, in favor of "a flexible approach, designed to account for factual nuances." Loveladies Harbor, Inc. v. United States, 28 F.3d 1171, 1181 (Fed.Cir.1994) (citing Deltona Corp. v. United States, 228 Ct.Cl. 476, 657 F.2d 1184 (1981)).

### ANALYSIS

#### A. Considerations Pertinent to Determining the Relevant Parcel

In addressing the relevant parcel or "denominator," a number of considerations

can have a bearing, including: (1) the degree of contiguity, (2) the dates of acquisition, (3) the extent to which a common development scheme applied to the parcel, (4) the extent to which the parcel has been treated as a single economic unit, (5) the extent to which the regulated lands enhance the value of the remaining lands, and (6) the extent any earlier development had reached completion and closure. *See Palm Beach Isles*, 208 F.3d at 1381 ("The timing of property acquisition and development, compared with the enactment and implementation of the governmental regimen that led to the regulatory imposition, is a factor, but only one factor, to be considered in determining the property denominator for analysis"); *Forest Props., Inc. v. United States*, 177 F.3d 1360, 1365 (Fed.Cir. 1999) (focusing on "the economic expectations of the claimant with regard to the property"); *Loveladies Harbor*, 28 F.3d at 1181 (considering "the timing of transfers in light of the developing regulatory environment"); *Brace v. United States*, 72 Fed.Cl. 337, 348 (2006) (identifying "relevant factual considerations"), *aff'd*, 250 Fed.Appx. 359 (Fed.Cir.2007).

With regard to the timing of property acquisition and development, there are some parallels between this case and precedents in the Federal Circuit where similar proper-parcel questions were raised.[12] For example, in *Palm Beach Isles*, a group of investors had purchased 311.7 acres of land in Florida in 1956. *Palm Beach Isles*, 208 F.3d at 1377. All but 50.7 acres of the original 311.7 acres were sold in 1968 to an unrelated developer. *Id.* Palm Beach Isles sought a permit to dredge and fill the remaining 50.7 acres in 1988, the denial of which was the subject of Palm Beach Isles' takings claim. *Id.* at 1378. In determining the relevant parcel to be the 50.7 acres for which Palm Beach Isles sought a permit, the court considered that "[t]he development of [the 261 acres sold in 1968] was physically and temporally remote from, and legally unconnected to, the 50.7 acres of

wetlands and submerged lake bed [for which Palm Beach Isles sought a permit]," and that "[c]ombining the two tracts for purposes of the regulatory takings analysis involved here, simply because at one time they were under common ownership ... cannot be justified." *Id.* at 1381. Like the 50.7 acre parcel at issue in *Palm Beach Isles*, Plat 57 is temporally, albeit not physically, remote from the other property on Stingaree Point which Lost Tree developed and sold in the early 1980s.

Economic aspects of development were particularly important to the result in *Forest Properties*. In that case, a real estate holding company, Big Bear Properties, Inc., had purchased 2,500 acres of land adjoining Big Bear Lake in Southern California. *Forest Properties*, 177 F.3d at 1361. Big Bear also secured an option to purchase up to 200 acres of lake-bottom land. *Id.* After filing a Section 404 permit to fill approximately 9 acres of lake-bottom, to be developed in conjunction with 53 acres of upland, Big Bear transferred the upland to Forest Properties, a commonly-owned entity, and soon thereafter also transferred the option to the pertinent lakebottom. *Id.* at 1363. The Section 404 permit was ultimately denied, and Forest Properties proceeded with development of the upland. *Id.* at 1363–64. Suit was then filed seeking just compensation for a taking respecting the lake-bottom. *Id.* The Federal Circuit affirmed the trial court's determination that the relevant parcel was the entire 62–acre tract covered by the initial development proposal, notwithstanding the different kinds of ownership in the upland—a fee title—and the lake-bottom—an equitable title derived from the option. The court considered "the economic reality of the arrangements, which transcended these legalistic bright lines." *Id.* at 1366.

Temporal aspects of development were more explicitly the crux of the disputed proper-parcel determination in *Loveladies Harbor*. Loveladies originally acquired a 250–

---

**12.** The Supreme Court has not spoken directly to the issue presented by this case. The decision of the Supreme Court in *Palazzolo v. Rhode Island*, 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001), addresses the timing of acquisition and development compared to the adoption of regulatory measures, but it does so not in determining the proper parcel but rather in the context particularly of evaluating the regulatory takings factor concerned with reasonable investment-backed expectations of the property owner.

acre tract on Long Beach Island, New Jersey, in 1958, and by 1972, it had developed 199 acres. 28 F.3d at 1174. To develop the remaining 51 acres, it needed to fill 50 acres. *Id.* Negotiations with the New Jersey Department of Environmental Protection generated a compromise that would allow developmental use of 12.5 of the 51 acres. *Id.* The development rights in the remaining 38.5 acres were dedicated to the State. *Id.* at 1180. The Corps rejected the fill permit on the acreage subject to the compromise. *Id.* at 1174. In addressing the relevant parcel, the Federal Circuit first eliminated from consideration the land developed prior to 1972. *Id.* at 1181. It also approved the exclusion of the acreage respecting which development rights had been dedicated to the State, leaving the 12.5 acres as the relevant parcel. *Id.*[13]

A distillation of the considerations providing the bases for decision in the pertinent precedents shows that the primary focus is on the economic reality of development and

the relationship of the parcel subject to the regulatory action to the overall developmental pattern. Here, no explicit overarching plan for development was ever prepared, but a definite pattern of development emerged on an opportunistic basis over time.[14] The key question that emerges is whether, and when, the developmental pattern had been completed such that Lost Tree's effort to pursue a Section 404 permit for Plat 57 and the Corps' action in denying that permit should be deemed temporally severed from the preexisting pattern. If it should be so severed, then it might be treated as having a relationship only to the other residual property Lost Tree owned on the Island of John's Island and Gem Island at the time of the permit application for Plat 57. If it should not be so severed, then it would be treated as a small part of the overall tract comprised of the Island of John's Island and Gem Island, as purchased by Lost Tree in 1974 in exercise of the last conveyances under the 1968 Option Agreement.

---

**13.** An earlier case, *Deltona Corp.*, 228 Ct.Cl. 476, 657 F.2d 1184, which was addressed at some length in *Loveladies Harbor, see* 28 F.3d at 1181, raised some temporal considerations but in a context where planned development was continuing. Plaintiff in *Deltona* had obtained two approvals from the Corps for what became Marco Island, Florida, in 1964 and then in 1969. 657 F.2d at 1188. However, when in 1973 it applied for permits respecting three additional segments of planned development, two permits were denied and one was granted by the Corps in 1976. *Id.* at 1188–89. The court rejected a takings claim respecting the two projects as to which approvals were denied, treating the area embraced by those projects as part of the overall parcel subject to the development plan. *Id.* at 1192.

Other cases cited by the parties seem less relevant to the proper-parcel inquiry. In *Ciampitti v. United States*, 22 Cl.Ct. 310 (1991), an investor-developer acquired "Purchase 7," upland and wetland tracts on a barrier island on the southern coast of New Jersey. *Id.* at 311. When the developer filed a takings claim as to the wetland tracts for which a permit was denied, the court considered the entirety of "Purchase 7" to be a single parcel because it was treated by the developer "as a single parcel for purposes of purchase and financing" and rejected the takings claim. *Id.*

In this same vein, *Norman v. United States*, 429 F.3d 1081, 1091 (Fed.Cir.2005), describes economic expectations as a "critical issue" in identifying the parcel as a whole. In *Norman*,

developers planned a commercial, industrial, and residential development on a property near Reno, Nevada, comprised of 2,425 acres that had been used for ranching and agriculture. *Id.* at 1085. As part of a mitigation plan, the developers were required to preserve or restore approximately 195 acres of wetlands, and the developer did so by deeding roughly 220 acres to a non-profit property owners' association. *Id.* at 1086–87. The developers sought compensation for the transferred property, but claims for an illegal exaction and for a taking were rejected. *Id.* at 1090–96.

**14.** Rather than an implementation of a comprehensive plan, Lost Tree's development of the community of John's Island apparently can be best characterized as an opportunistic progression. Lost Tree developed several different communities over the course of thirty years, beginning with residences and golf courses on the Barrier Island, and, after a hiatus, moving on to the Island of John's Island, and concluding with the development of homesites on Gem Island. Different covenants were recorded for different lots or groups of lots, and, as the different communities within the larger community of John's Island were developed, several different homeowners' associations were formed for those communities, although today most if not all of those associations have merged into JIPOA. Stip. ¶ 125. As discussed *supra*, membership in the golf and beach clubs in the community of John's Island is independent of home ownership in the community.

### B. Concluding Aspects of Development

Lost Tree contends that Plat 57 should not be coupled with the other developments that had taken place in the past on the Island of John's Island, Gem Island, and the Barrier Island because those developments had occurred some years earlier and Lost Tree sought a permit for Plat 57 when it only owned that property and a very few other scattered small tracts not suitable for development. Pl.'s Mot. for Partial Summary Judgment at 23 ("Pl.'s Mot."). The government contends that excluding previously owned property would contravene the "parcel as a whole" rule derived from *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Def.'s Cross–Mot. for Partial Summary Judgment at 36 ("Def.'s Cross–Mot."). The government disputes that Lost Tree never had an overarching development plan, Def.'s Cross–Mot. at 34, and it argues that Plat 57 is and was a wetland that provides value to the community of John's Island. *Id.*

Given these competing claims, the progression of Lost Tree's development and the role of Plat 57 are important, particularly insofar as the development of the Island of John's Island and the peninsula known as Stingaree Point at the southern edge of the Island of John's Island are concerned. Lost Tree recorded Plat 40 in November 1985, covering six lots on the south and east sides of Stingaree Point. Stip. ¶ 71. These lots were sold within a few years, *id.*, and that was the last significant development by Lost Tree on the Island of John's Island. Plat 57 is located on the north side of Stingaree Point, but it was not platted at the time Lost Tree developed the other six lots on that peninsula; rather, nothing was then planned for the north side of Stingaree Point. Stip. ¶¶ 102–103. By 1989, Lost Tree had moved on to record Plat 52, covering all 40 lots on Gem Island. Stip. ¶ 75.

Gem Island was the last significant portion in the community of John's Island to be developed. Lost Tree addressed the development of the Barrier Island first, in the 1970s, *see* Stip. ¶ 24, then turned to the Island of John's Island, which was substantially completed by the mid–1980s, *see* Stip. ¶ 74, and finally developed and sold the lots on Gem Island in the late 1980s and early 1990s. *See* Stip. ¶¶ 75–76. The mid–1990s marked the termination of Lost Tree's development operations. At this time, the focus of Lost Tree's business shifted to management of an investment portfolio, and Lost Tree changed its tax status to suit this new focus. *See supra*, at 6 & n. 10.

The government discounts this shift in Lost Tree's focus, emphasizing the facts that Plat 57 was purchased as part of the extensive lands acquired via the 1968 Option Agreement and that Lost Tree reaped significant benefits from development of those lands. Def.'s Cross–Mot. at 38–39. Lost Tree focuses on the circumstances that Plat 57 was a residual property remaining after nearly all of the other lands acquired under the 1968 Option Agreement had been sold and conveyed and that Plat 57 was never a part of any development plan for any of the previously sold plats and tracts. Pl.'s Mot. at 31–34. In making these arguments, the parties largely ignore the dispositions of properties by Lost Tree after it had ceased developmental activities.

### C. Dispositions of Scattered Tracts

By the mid–1990s, Lost Tree, guided by its new president, Mr. Bayer, was focused on managing Lost Tree's investment portfolio. Stip. ¶ 81. A few residual parcels in Indian River County remained that had been acquired pursuant to the 1968 Option Agreement. Lost Tree undertook sale of three lots comprising Plat 55, recorded in 1998, near the base (or eastern-most part) of Stingaree Point, *see* Stip. ¶ 88,[15] and Plat 54, covering three lots on Horse's Head, for which Lost Tree submitted a Section 404 permit application in July 1997, prior to sale to a development group that successfully pursued that permit application. Stip. ¶¶ 89–93. The so-called "North Acreage" was sold to an unrelated party in 1999. Stip. ¶¶ 84. Conservation easements for islands and wetland par-

---

15. The Stipulations do not address when the three lots comprising Plat 55 were actually sold.

*See* Stip. ¶ 88.

cels were granted in 2001 to various federal and state governmental entities. *See supra,* at 7. Additionally, the Lost Tree Islands in the Indian River were sold as part of a settlement of a zoning dispute with the City of Vero Beach and the Town of Indian Shores. Stip. ¶ 85. After those dispositions, Lost Tree had a relatively attenuated connection to the community of John's Island.[16]

The circumstances of these sales and dispositions, particularly the grants of conservation easements to governmental entities, are not addressed by the extensive stipulations supplied by the parties. Similarly, the parties do not focus on these sales and dispositions in their arguments, although the prior decisions in *Loveladies Harbor, Forest Properties,* and *Palm Beach Isles* indicate that these sales and dispositions may be critical to the result in this case. These grants might, or might not, have a bearing on the temporal aspects of Lost Tree's closure of development of, and any continuing relationship to, the property comprising the Island of John's Island and Gem Island, acquired by Lost Tree in 1974, 27 years earlier, under the 1968 Option Agreement, entered 33 years earlier. In short, the record relative to Lost Tree's disposition of property after it ceased developmental operations is deficient.

### D. *Plat 57 as an Afterthought*

Located at the edge of the Island of John's Island, Plat 57 is contiguous to, and physically a part of, the community of John's Island. It can be reached by road only by first passing through one of the gates for entry into the community. That factor weighs in favor of treating Plat 57 as part of a larger tract that would, at a minimum, consist of the Island of John's Island, and perhaps include Gem Island as well. However, Lost Tree's attempt to develop Plat 57 was temporally separated from the segmented development of the rest of the community, and the Plat was never anticipated in any of the prior permit submissions for piecemeal development. As early as 1986, Lost Tree's develop-

ment of Stingaree Point was substantially complete, *see* Stip. ¶ 74, and by that time, Lost Tree had shifted its focus from the development of the Island of John's Island to Gem Island, before converting to an asset management company in the mid-1990s and changing its tax status. *See* Stip. ¶¶ 75–76, 80–81. Except for sale of the "West Acreage" in 2004, which property consisted of about 35 acres of land located about five miles west of Gem Island, Stip. ¶ 83, Plat 57 was a residual parcel that Lost Tree addressed as an afterthought. *See* Stip. ¶¶ 104–110.

Lost Tree filed its applications for permits for Plat 57 with the Town of Indian River Shores and the Corps in August 2002, Stip. ¶¶ 110–111, after it had completed disposition of other nearby residual properties.[17] Plat 57 appears to have little value in its present state, either environmentally or aesthetically. Rather than enhance the value of the lands around it, *i.e.,* the lots on the east and south sides of Stingaree Point, Plat 57 draws value from those parcels.

### E. *Synopsis*

The key then to the relevant parcel determination in this case is found in nuances concerning the degree of completion of Lost Tree's development within the community of John's Island prior to the advent of Plat 57. In denying Lost Tree's Section 404 permit application, the Corps stated that "the project purpose has already been realized through the development of home-sites within the subdivision," Stip. Ex. U at LTVC014016, raising questions regarding the regulatory link between the earlier development and Plat 57. The residuum of land represented by Plat 57 was never part of a permit application submitted by Lost Tree for any part of the Island of John's Island and thus it was not explicitly tied as an economic matter to the properties previously developed, sold, or transferred, except as a surviving relict. Whether Plat 57 was im-

---

16. The later disposition in 2004 of the "West Acreage" to an unrelated party, Stip. ¶ 86, does not alter this conclusion because the West Acreage was about five miles distant from Gem Island, Stip. ¶ 9, and never was associated with the community of John's Island.

17. As described earlier, the other post-development dispositions of residual properties on the Island of John's Island had occurred in 1997 (Horse's Head) and 1998 (Plat 55).

plicitly tied to the prior development, as the government argues, cannot be resolved on the stipulated facts. In this respect, Lost Tree's extensive activity to wind up its presence in the area, including making final sales and grants of easements of the outlying islands and stray parcels, prior to seeking a permit for Plat 57, raises open questions. Accordingly, the court denies both cross-motions for summary judgment on the issue of the relevant parcel.

## CONCLUSION

For the reasons stated, the extensive stipulations of fact filed by the parties are insufficient to resolve issues material to a disposition of this case. Accordingly, plaintiff's motion for partial summary judgment on the issue of the relevant parcel and the government's cross-motion for partial summary judgment on the same issue are DENIED. The disputed issues are remitted for trial. The parties are requested to file a joint status report on or before June 11, 2010, addressing the matters encompassed by RCFC Appendix A, ¶¶ 5 and 12 (last sentence), with respect to preparations for a trial of the material issues in dispute.

It is so ORDERED.