# United States Court of Appeals for the Federal Circuit

---

**CCA ASSOCIATES,**
*Plaintiff-Cross Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

---

2010-5100, -5101

---

Appeal from the United States Court of Federal Claims in case no. 97-CV-334, Judge Charles F. Lettow.

---

Decided: November 21, 2011

---

ELLIOT E. POLEBAUM, Fried, Frank, Harris, Shriver & Jacobson, LLP, of Washington, DC, argued for plaintiff-cross appellant.

DAVID A. HARRINGTON, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, BRIAN M. SIMKIN, Assistant Director, ELIZABETH SPECK and KENNETH D. WOODROW, Trial Attorneys.

---

Before DYK, MOORE, and O'MALLEY, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* Moore. Opinion concurring in the judgments and dissenting-in-part filed by *Circuit Judge* Dyk.

MOORE, *Circuit Judge*.

The United States appeals from the decision of the Court of Federal Claims that the Emergency Low Income Housing Preservation Act, Pub. L. No. 100-242, § 202, 101 Stat. 1877 (1988) (ELIHPA), and the Low-Income Housing Preservation and Resident Homeownership Act, Pub. L. No. 101-625, 104 Stat. 4249 (1990) (LIHPRHA) resulted in a temporary regulatory taking. CCA Associates (CCA) cross-appeals, asserting that ELIHPA and LIHPRHA resulted in a breach of the government's contractual obligations. Because we are bound to apply the economic analysis outlined in *Cienega X*, we conclude that the Court of Federal Claims determination on the temporary taking must be reversed. Because the Court of Federal Claims correctly held that our *Cienega IV* precedent forecloses CCA's breach of contract claim, we affirm the judgment against CCA on the breach of contract claim.

BACKGROUND

The history of the statutes involved in ELIHPA and LIHPRHA takings cases was summarized by this court on several occasions. *See, e.g.*, *Cienega Gardens v. United States*, 503 F.3d 1266 (Fed. Cir. 2007) (*Cienega X*); *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) (*Cienega VIII*); *Cienega Gardens v. United States*, 194 F.3d 1231 (Fed. Cir. 1998) (*Cienega IV*). A brief recap of the legislative background leading up to ELIHPA and LIHPRHA is necessary to understand the issues in this case. In 1961, Congress amended the National Housing

Act to allow private developers to meet the needs of moderate income families. *Cienega X*, 503 F.3d at 1270. Among other things, the amendment provided financial incentives to private developers to build low income housing. *Id.* These incentives included below-market mortgages, which permitted the owners to borrow 90% of the cost of the project. *Id.* While the term of the mortgage was 40 years, the contracts allowed the developer to prepay the mortgage after 20 years. *Id.* Congress also protected the lenders against default by authorizing the Federal Housing Administration to insure the mortgages. *Id.* at 1270-71. The tax laws at the time provided a number of tax incentives, which allowed general and limited partners to take large deductions in the earlier years of the investment. *Id.* at 1271. The highly leveraged nature of the investment made the tax benefits large in comparison to the small up-front investment. *Id.*

These development programs were regulated by the Department of Housing and Urban Development (HUD), and the developers were required to sign a regulatory agreement binding them to get approval from HUD for certain relevant decisions, for example increases in rent. *Id.* The developer also signed a secured note and a mortgage. HUD, in turn, provided mortgage insurance for the investment. *Id.* The restrictions in the regulatory agreement were in effect as long as HUD insured the mortgage on the property; for practical purposes this meant the developers were subject to HUD regulation until the mortgage was paid off. *Id.* The twenty year prepayment option in the mortgage therefore gave the developers an opportunity to cast off the regulatory burden and convert their development to market rate housing.

While this plan induced developers to provide low income housing, Congress ultimately grew worried that participants would prepay their mortgages and exit the

program en mass. *Id.* at 1272. In order to avoid the resulting shortage of low income housing, Congress enacted ELIHPA and LIHPRHA. *Id.* The exact restrictions placed on the developers are detailed in, e.g., *Cienega X*, but the salient issue in this case is that an owner was no longer free to prepay the mortgage after twenty years. Instead, the owner either needed HUD approval to prepay the mortgage (which was not a viable option, *id.* at 1272 n.2), or go through a series of regulatory hoops that would delay prepayment and therefore extend the time the landowner was subject to HUD regulation, *id.* at 1272-73. Among other restrictions, while under HUD regulation the landowner could not charge market rates for renting the property. Eventually, Congress restored prepayment rights to the program participants. *Id.* at 1274.

In order to enter the program, the developer signed three documents: the regulatory agreement, the secured note, and the mortgage. In this case, each of these three documents were contemporaneously signed by Ernest B. Norman and J. Robert Norman in a conference room at HUD's New Orleans office in 1969. *CCA Assocs. v. United States*, 91 Fed. Cl. 580, 585-86 (2010).[1] Each document was drafted by HUD, and these agreements were written on either HUD or Federal Housing Authority forms. *Id.* at 586. The secured note, which was endorsed by HUD, included a term allowing prepayment after 20 years, and also incorporated the mortgage by reference. *Id.* The mortgage, in turn, incorporated the secured note and regulatory agreement by reference, and was signed by the Norman brothers and the Pringle-Associated Mortgage Corporation (but not by HUD). *Id.* Finally, the regula-

---

[1] HUD later approved an increase in the amount of the mortgage, and the Norman brothers signed a second secured note and second mortgage—once again on HUD forms—in 1971. *CCA*, 91 Fed. Cl. at 586 n.7.

tory agreement was signed by HUD and the Norman brothers. In the regulatory agreement, the Norman brothers agreed to charge HUD-approved rents to HUD-approved tenants as long as the contract for mortgage insurance continued in effect. The regulatory agreement incorporated by reference legislation and regulations related to the program. *Id.* In sum, HUD was a signatory to only the regulatory agreement, which did not expressly include the 20 year prepayment provision. The Norman brothers later transferred their interest to CCA. *Id.* at 586-87.

Under the terms of the documents signed by the Norman brothers, the 20 year prohibition on prepayment expired in May 1991. *Id.* at 602. As a result of LIHPRHA, however, CCA was not allowed to prepay the mortgage and was forced to continue to operate the development (Chateau Cleary) as low income housing. In 1996, Congress lifted its prior restriction on prepayment with the HOPE Act. The total time that CCA was prohibited from prepayment was five years and ten days. *Id.*

This case involves two issues related to the restriction on prepayment effectuated by ELIHPA and LIHPRHA (the "preservation statutes"). First, does the restriction on prepayment, which resulted in limitations on the property owner's use of its land due to the required continued participation in the HUD program, constitute a temporary regulatory taking? The Court of Federal Claims held that the statutory restriction of prepayment rights constituted a taking. The United States appeals this portion of the decision. Second, did Congress breach the contract between HUD and CCA by abrogating the prepayment right, thereby mandating the property continue to be subject to use and rent restrictions? The Court of Federal Claims held that the statutory restriction of prepayment rights did not constitute a breach of contract.

CCA cross-appeals this portion of the decision. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

ANALYSIS

The issues presented in this case are not unique to CCA. The ELIHPA and LIHPRHA statues spurred a number of claims from parties similarly situated to CCA. Much of our jurisprudence in the area stems from the *Cienega Gardens* line of cases, which sets out a framework that we are bound as a panel to apply to the case at hand. Indeed, CCA's claims in this case were previously remanded for consideration and application of our decision in *Cienega X*, 503 F.3d 1266. *CCA*, 91 Fed. Cl. at 584.

Many of CCA's arguments in this case are directed at issues resolved by *Cienega X* and *Cienega IV*. Even if we are sympathetic to the arguments challenging the propriety of the economic analysis required by *Cienega X* and the breach of contract law of *Cienega IV*, we cannot consider these arguments at the panel stage. Panels are bound by the law of prior panels. *See Hometown Financial, Inc. v. United States*, 409 F.3d 1360, 1365 (Fed. Cir. 2005) ("[W]e are bound to follow our own precedent as set forth by prior panels.").

## I. *CCA'S TAKINGS CLAIM*

Typically, when considering whether government action constitutes a regulatory taking, we apply factors set forth in *Penn Central*: (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978). We will consider each of these

factors in light of the legal rules of *Cienega X*, by which we are bound.

## A. Economic Impact

The first factor in a takings analysis is the "economic impact on the claimant." *Penn Cent.*, 438 U.S. at 124. The economic impact of the five year delay in prepayment has admittedly been a bit of a moving target. Applying an analytical approach previously affirmed by this court in *Cienega VIII*, the trial court initially found an 81.25% diminution in return on equity as a result of the five years that the preservation statutes prohibited prepayment. *CCA*, 91 Fed. Cl. at 611. This return on equity approach compared the return on equity under the preservation statutes with the return on equity CCA would have received but for the preservation statutes. *Id.* In *Cienega X*, however, we held that any economic impact must be evaluated with respect to the value of the property as a whole, and not limited to the discrete time period that the taking was in force. *Cienega X*, 503 F.3d at 1280. After noting that "[i]n temporary takings cases, the courts ordinarily have looked to rental value or other equivalent measures of non-permanent use," *id.*, the Court of Federal Claims applied our revised *Cienega X* approach to the calculation of economic impact. Though CCA disagreed with the approach required by *Cienega X*, the parties stipulated that in light of *Cienega X*, "'CCA suffered an economic impact of 18 percent as a result of ELIHPA and LIHPRHA,'" not accounting for any offsetting benefits. *CCA*, 91 Fed. Cl. at 612 (quoting the Joint Stipulation of Facts).

In *Cienega X*, however, we held that any economic impact to the plaintiffs must be weighed against any offsetting benefits that they received from the preserva-tion statutes. *Id.* at 1282-83. We identified a number of

possible benefits and reasoned that these benefits might serve to offset any economic harm. *Id.* at 1284-87. When these benefits are established, they "must be considered as part of the takings analysis." *Id.* at 1283-84.

The Court of Federal Claims correctly explained that its offsetting benefits analysis "must consider facts as they existed in New Orleans at the time, not merely what the regulations indicate was possible." *Id.* at 618. It then analyzed different benefits, concluding, *inter alia*, that "a fair-market sale under LIHPRHA before September 1996 is too speculative to offset the economic loss imposed on CCA by the prepayment restrictions." *Id.* As part of this analysis, the court concluded that "the burden is on the government to show that other statutory benefits should offset" the economic impact. *Id.* at 613-14.

We see no error in this analysis and apportionment of the respective burdens. Although the plaintiff has the burden to prove a taking occurred, this ultimate burden does not require the plaintiff to identify and come forward with evidence rebutting economic harm. The plaintiff must establish economic impact, but it need not establish the absence of any mitigating factors. Offsetting benefits, if there are any, must be established by the government to rebut the plaintiff's economic impact case. *Cf. Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1275 (Fed. Cir. 2009) (refusing to apply offsetting benefits when the "government points to no economic data in the record to support its assertion of offsetting benefits"). Once CCA came forward with evidence of an economic impact, the government then had the burden to establish any offsetting benefits which would mitigate or reduce the impact.[2] Contrary to the government's argument, and the

---

[2] The trial court correctly held that the government must prove (1) the existence of offsetting benefits and (2)

dissent's claims, nothing in *Cienega X* requires the plaintiff to bear the burden of establishing the value of offsetting benefits. What *Cienega X* held is that, in assessing whether a takings has occurred, "available offsetting benefits must be taken into account generally, along with the particular benefits that actually were offered to the plaintiffs." 503 F.3d at 1287. This is precisely what was done here. The Court of Federal Claims conducted a thorough analysis of the offsetting benefits evidence proffered by the government, and concluded the potential benefits were too speculative to mitigate CCA's proof of economic harm. We see no error in this analysis and no clear error in the extensive fact findings of the trial court on the offsetting benefits.

Since the government failed to establish any offsetting benefits, the economic impact, given the requirements of *Cienega X*, is stipulated to be 18%. Although CCA lost over $700,000 of net income (81.25% during the five years), using the economic impact methodology of *Cienega X*, the economic impact of 18% is not substantial enough to favor a takings in this specific case. While there is no per se rule, the economic impact must be more than a mere diminution. *Cienega VIII*, 331 F.3d at 1343. For

---

the value of those benefits. A non-speculative valuation of any potential benefits is necessary to accurately establish whether they offset the economic impact on the landowner. The Court of Federal Claims found that the government failed to prove by a preponderance of the evidence that the proffered offsetting benefits in this case had any non-speculative value. *See, e.g., CCA*, 91 Fed. Cl. at 614 (discussing whether sale was "probable"); *id.* at 617 (while "possible" that a buyer could be identified, that "possibility is uncertain" and a sale therefore too speculative to offset harm); *id.* at 618 (possibility of sale "too speculative to offset the economic loss" of prepayment restriction). Preponderance of the evidence is the correct standard, and we see no error in this analysis.

example, we have previously held that a loss of 77% of the value in the property is a compensable taking. *Id.* Like the government, we are "aware of no case in which a court has found a taking where diminution in value was less than 50 percent." Appellant Br. 19 (citing cases, all of which have at least a 50 percent diminution in value). In light of the facts of this case, we cannot conclude that an 18% economic impact qualifies as sufficiently substantial to favor a taking. Because we are bound by the economic impact methodology of *Cienega X*, we must conclude that the Court of Federal Claims erred when it held that this factor supported a taking.

Ultimately, the difference between the *Cienega X* and *Cienega VIII* methodology is the difference between an 18% and 81% economic impact, a substantially different result stemming solely from our change in the economic analysis between the two cases. While the plaintiff stipulated to the 18% economic impact, CCA continued to dispute the propriety of the *Cienega X* methodology. *Cienega X* makes it virtually impossible for any ELIHPA or LIHPRHA plaintiff to establish the severe economic impact necessary for a takings. Rather than consider the impact the regulation had on the property during the time it was in effect, such as the amount of money the plaintiffs actually lost in rents during that time period, *Cienega X* requires that the impact be measured against the total value over the remaining life of the property. *See id.* at 1281-82 (stating the test for a regulatory taking must "'compare the value that has been taken from the property with the value that remains in the property'" (quoting *Penn Central,* 508 U.S. at 644)).[3]

---

[3]   *Cienega X* bases this "life of the property" requirement on the Supreme Court decision in *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning*

In the case of ELIHPA or LIHPRHA plaintiffs the mortgage notes lasted 40 years with 20 year prepayment options. ELIHPA and LIHPRHA prevented prepayment for at most 8 years. Hence, HUD participants had to maintain the property as low income housing for at most 8 years longer than they should have under the mortgage contracts. This means the denominator for the takings analysis in these cases is the total net income over the entire remaining useful life of the property (the net income over the rest of the mortgage – generally 20 years). If the net income over the entire remaining life of the mortgage is the denominator there is no way that even a nearly complete deprivation (say 99%) for 8 years would amount to severe economic deprivation when compared to our prior regulatory takings jurisprudence. If this methodology were to apply beyond ELIHPA and LIHPRHA cases, for example to temporary regulatory restrictions on fee simples, then all income earned over the entire remaining useful life of the real property would be the denominator. This would virtually eliminate all regula-

---

*Agency*, 535 U.S. 302 (2002). *Cienega VIII* actually addressed the relevance of *Tahoe Sierra* expressly holding that the impact to the property as a whole was employed in *Tahoe Sierra* in order to determine whether the regulatory taking should be treated as a *Lucas* style per se taking. 331 F.3d 1344-45. The *Cienega VIII* court explained that this "whole property" concept was not employed in the context of analyzing the economic impact under the *Penn Central* regulatory taking factors. *Id.* In fact, the relatively short timespan of the 32 month moratorium in *Tahoe-Sierra*, as compared to the entire life of the property, did not cause the Supreme Court to dismiss the possibility that "if petitioners had challenged the application of the moratoria to their individual parcels, instead of making a facial challenge, some of them might have prevailed under a *Penn Central* analysis." 535 U.S. at 334.

tory takings. Quite frankly, the selection of the denominator in these cases is going to determine the severity of the economic impact. In *Cienega X*, we deviated from the traditional lost rent or return on equity approach, and instead required that the lost income be compared to all of the money the property would earn over its remaining life. We are bound by *Cienega X*, but note that its application is limited to the ELIHPA and LIHPRHA cases.

While the parties may be correct that this economic impact analysis required by *Cienega X* virtually forecloses the finding of a takings in these cases, that there is conflict between *Cienega VIII* and *Cienega X*, and that this analysis was not required by *Tahoe-Sierra*, it is clearly required by *Cienega X*, and we are bound to follow that case. Therefore, we conclude that the Court of Federal Claims erred when it held that the 18% economic impact weighed in favor of a taking.

## B. Investment-Backed Expectations

In *Cienega X*, we explained that in LIHPRHA and ELIHPA takings cases, the analysis of whether the landowner had a reasonable investment-backed expectation in the pre-payment of the mortgage requires a multistep analysis. *Cienega X*, 503 F.3d at 1289. By comparing the individual's expectations with the "expectations of the industry as a whole," we aimed to separate unreasonable, though subjectively believed, investment backed expectations from objectively reasonable expectations. *Id.* at 1290. The government argues that CCA's expectations of prepayment are unreasonable since many developers participated in the program primarily for the tax benefits.

*Cienega X*, however, does not suggest that there can only be one objectively reasonable investment strategy for the industry, and we hold that there can potentially be multiple objectively reasonable investment strategies

dictated by geography, economics, or other factors. While the government's evidence in this case suggests that one class of investors was motivated primarily by the tax benefits, this does not end the inquiry: the plaintiff can offer proof that other investment strategies are also objectively reasonable. CCA has the burden to present sufficient evidence of these other strategies to establish that it was objectively reasonable for it to view the 20 year prepayment clause as the primary or "but for" reason for investment. *Id.*

We believe CCA failed to carry its burden. The Court of Federal Claims explained that "factors associated with the location and character of projects strongly influenced the reasonable expectation of the owners, judged on an objective and not a subjective basis." *CCA*, 91 Fed. Cl. at 609. While this may be true, the only objective evidence of the industry's investment backed expectations is a quote from a 1972 guide which indicated that a project located "in a growing suburban or exurban area, it *may* increase in value over the years, thus creating *substantial residual profits* to the investors upon sale or other disposition." *Id.* (quotations, citations omitted, emphasis added). This hypothetical statement, however, does not support the ultimate conclusion that it was objectively reasonable to view the 20 year prepayment as either the principle or but for cause of investment. In fact, the same guide indicates that one of the principal benefits of the investment is the tax shelter. *Id.*

The Court of Federal Claims also cited evidence that some developers (three out of the six considered) retained residual proceeds from a sale or other disposition of a project. *Id.* at 608. Again, however, the prospectuses for these developers "described the potential benefits for investing in the projects as being *primarily* tax benefits and *secondarily* cash distributions." *Id.* (emphasis added).

While the trial court conducted a thoughtful analysis of the disparate treatment of tax benefits, the fact that "the general partners in three of the six instances were willing to sell short-term tax benefits and dividends but wanted to retain a significant portion of the long-term benefits from property appreciation" is not enough to demonstrate it was objectively reasonable to view the 20 year prepayment clause as the but for or primary reason for investment. The fact that the prospectuses[4] in question "do not assign any weight to the ability to prepay after 20 years as a reason to invest, with most dismissing the possible net proceeds from prepayment after 20 years at a nominal value of one dollar," *id.* at 608, further undercuts the evidence that CCA's subjectively believed investment strategy was objectively reasonable. Because the evidence in this case fails to demonstrate that CCA's investment backed expectations were objectively reasonable in light of industry practice as a whole, as required by *Cienega X*, the Court of Federal Claims erred by holding this factor weighed in favor of a taking.

## C.  Character of the Governmental Action

*Cienega X* did not disturb our prior precedent relating to the character of the government action. As a result, when we remanded this case to the Court of Federal Claims, it was reasonable for the trial court to reinstate its prior character analysis. *CCA*, 91 Fed. Cl. at 601-02. Indeed, *Cienega VIII* explained that "as a matter of law, that the government's actions in enacting ELIHPA and LIHPRHA, insofar as they abrogated the [plaintiffs'] . . .

---

[4]   *Cienega X* indicates that contemporaneous documents, such as prospectuses, may help prove the existence of objectively reasonable investment strategies. 503 F.3d at 1290-91. *Cienega X*, however, does not require the use of prospectuses, and other kinds of evidence may be equally enlightening.

contractual rights to prepay their mortgages and thereby exit the housing programs, had a character that supports a holding of a compensable taking." *Cienega VIII*, 331 F.3d at 1340. As such, the Court of Federal Claims correctly held that "the character of the government action is not such as to deliver the dispositive blow that CCA has hoped, [but] it nonetheless weighs in favor of a finding of a regulatory taking." *CCA*, 91 Fed. Cl. at 602.

### D. Summary

While the character of the government's action supports finding a taking, it is not dispositive of this issue. Because we are bound by the analysis of *Cienega X*, and the other factors weigh against a taking, we conclude that CCA failed to establish that the denial of the prepayment right constituted a regulatory taking.

### II. *CCA'S CONTRACT CLAIM*

CCA cross-appeals the holding that there is no privity of contract between HUD and CCA.[5] The Court of Federal Claims held CCA's contract claim in this case is foreclosed by *Cienega Gardens v. United States*, 194 F.3d 1231 (Fed. Cir. 1998) (*Cienega IV*). *CCA*, 91 Fed. Cl. at 598. Although CCA attempts to distinguish *Cienega IV* on the facts, we agree with the trial court that these distinctions are unavailing. Simply holding that *Cienega IV* controls this issue, however, ignores the exceedingly thoughtful and thorough analysis of this issue carried out by the Court of Federal Claims in its opinion.

There are three relevant documents in this case: the regulatory agreement, the secured note, and the mort-

---

[5] The government argues CCA waived its contract claim. We disagree: the Court of Federal Claims properly allowed CCA to proceed on this issue in light of our previous remand. *See CCA*, 91 Fed. Cl. at 591 n.14.

gage. CCA argued that these three documents constitute one overall transaction. *CCA*, 91 Fed. Cl. at 592. The three documents are pre-printed, standard HUD forms, and were signed contemporaneously in a single room in HUD's New Orleans office. *Id*. HUD only signed one of the three documents, the regulatory agreement, *id*. at 591, which did not mention the right to prepay the mortgage or incorporate the secured note (which did include the right to prepay), *id*. at 592. The regulatory agreement does, however, reference HUD's regulations, which specified the prepayment right. *Id*. HUD also endorsed the secured note, which explicitly articulated CCA's right to prepay the mortgage. *Id*. at 591.

Ultimately, all three documents are intended to reach a single goal: to induce developers to provide low income housing. Each of these three documents forms a critical part of the overall transaction, and without any one of these documents, the overall terms binding CCA would be substantially different. *Id*. at 592. Faced with these interrelated documents, the trial court asked: "Does the failure of the regulatory agreement to expressly incorporate the other two instruments negate the general contractual principle that interrelated instruments should be considered together?" *Id*. at 594-95. While our opinion in *Cienega IV* answers this question in the negative, the Court of Federal Claims pointed out that reading the three documents together "gives effect to the fact that the 20-year limit on prepayment contained in the secured note was a provision drafted by HUD that replicated HUD's regulations on prepayment and was used by HUD to induce participation in the program." *Id*. at 595. The Court of Federal Claims ultimately concluded that "[c]onsidering that the documents at issue constitute an integrated transaction, and in light of the other circumstances surrounding the transaction, this court, but for

the precedent in *Cienega IV*, would hold that HUD and CCA were in privity as to the 20-year prepayment provision." *Id.* at 598.

The trial court is not alone in its criticism of *Cienega IV*. In *Aspenwood Investment Co. v. Martinez*, 355 F.3d 1256 (10th Cir. 2004), the Tenth Circuit confronted an analogous issue in the context of a declaratory judgment action. While it noted that *Cienega IV* was the case "most directly on point," it nevertheless found "the analysis of the dissent [in *Cienega IV*] . . . more persuasive than that of the majority." *Id.* at 1260. The Tenth Circuit reasoned "that by executing the regulatory agreement, the note, and related documents," the landowner promised to operate the housing project to effectuate the purpose of the HUD regulations, and noted that the landowner's "promises were primarily for the benefit of HUD (and the participants in the low income housing program), not for the lender." *Id.* In light of these circumstances, the Tenth Circuit concluded that the three documents constituted "a single, overarching agreement," and held that "it was the demonstrated intent of HUD (and of plaintiff and of the lender) to be bound by the terms of all of the parts of the transaction." *Id.*

*Cienega IV* turned on our conclusion that "there was not privity of contract between HUD and the [landowners] with respect to prepayment of the deed of trust notes." 194 F.3d at 1246. In reaching this conclusion, we started "from the premise that the United States, i.e., HUD, was a named party to only one contract," the regulatory agreement. *Id.* at 1241-42. We acknowledged the *Restatement (Second) of Contracts* § 202(2) (1981) rule that "'all writings that are part of the same transaction are interpreted together.'" *Id.* at 1243 (quoting the *Restatement*). We also acknowledged that this rule "does 'not depend upon any determination that there is an ambigu-

ity, but [is] used in determining what meanings are reasonably possible as well as in choosing among possible meanings.'" *Id.* (quoting the *Restatement*). We even conceded that "the deed of trust note . . . and the regulatory agreement were part of the same transaction." *Id.* Thus, as highlighted by the dissent in *Cienega IV*, the Tenth Circuit in *Aspenwood*, and the Court of Federal Claims in this case, it is certainly possible that the three agreements should be interpreted together. We nevertheless found that "each document stands alone and is unambiguous on its face," and that the "documents evidence separate agreements between distinct parties." *Id.*

The facts in this case do not distinguish it from *Cienega IV*, which we must apply to the case at hand. We therefore hold that the Court of Federal Claims correctly determined that *Cienega IV* forecloses CCA's contract claims in this case. To the extent CCA believes either *Cienega IV* or *Cienega X* was wrongly decided, en banc review is its only course of action.

**AFFIRMED-IN-PART and REVERSED-IN-PART**

COSTS

No costs.

# United States Court of Appeals
## for the Federal Circuit

---

**CCA ASSOCIATES,**

*Plaintiff-Cross Appellant,*

v.

**UNITED STATES,**

*Defendant-Appellant.*

---

2010-5100, -5101

---

Appeals from the United States Court of Federal Claims in case no. 97-CV-334, Judge Charles F. Lettow.

---

DYK, *Circuit Judge*, concurring in the judgment and dissenting-in-part.

I agree with the majority's decision to reverse the Claims Court judgment finding a regulatory taking and with the majority's affirmance of the Claims Court's dismissal of the contract claim. I write separately because I disagree with the majority's reasoning in significant respects. In particular, I disagree with the majority's incorrect and wholly unnecessary dictum approving aspects of the Claims Court's takings analysis. In my view, the majority's decision refusing to consider offsetting benefits is directly contrary to our precedent, and its treatment of the character of the government action fails to recognize that the government's action is a form of rent

control that the Supreme Court and other circuits have found to be legitimate.

## I  The Economic Impact Analysis

This case again presents the question whether the rent-control restrictions of ELIHPA and LIHPRHA constituted a regulatory taking. In *Cienega Gardens v. United States* ("*Cienega X*"), 503 F.3d 1266, 1282-87 (Fed. Cir. 2007), we held that an analysis of the economic impact prong of the takings analysis required a consideration of offsetting benefits during the period that the restrictions of ELIHPA and LIHPRHA were in place, namely consideration of the right to sell the property for fair market value and, failing such a sale, the right to exit the program and to be free of the rent control and other restrictions. The necessity of considering such benefits was not merely a suggestion. It was a direct holding expressed repeatedly in the language of the opinion. We held in *Cienega X* that the "error committed by the [Claims Court] lies in its failure to consider the offsetting benefits that the statutory scheme afforded which where specifically designed to ameliorate the impact of the prepayment restrictions." *Id.* at 1282-83. "The [offsetting] benefits must be considered as part of the takings analysis" itself, not merely as part of a just compensation calculation. *Id.* at 1283-84.

The Claims Court here, in direct contradiction of our holding in *Cienega X*, refused to consider offsetting benefits in the economic impact analysis, finding those benefits to be "speculative." *CCA Assocs. v. United States*, 91 Fed. Cl. 580, 618 (2010). While reversing the decision of the Claims Court, the majority, without justification, approves the Claims Court's refusal to follow *Cienega X*.

The Claims Court's justification for refusing to consider offsetting benefits rests on two subordinate and

incorrect propositions—first, that the burden of proof on offsetting benefits rested with the government, and second, that the government could not bear its burden of proof unless it established that CCA, the owner of the property, could actually have sold the property during the period of the restrictions. I consider each of these in turn.

## A  The Burden of Proof

As I discuss in greater detail below, the design of LIHPRHA was to impose a form of rent control on the developers of low-income housing that received federal financial assistance.[1] The impact of LIHPRHA was to keep this rent control in place for an additional five years subject to the ability of the owners to sell their property for fair market value or to prepay the mortgage and exit the program. The claim is that the developers here lost money because they were forced to charge below-market rents for this five-year period.

The economic impact analysis is, of course, part of the three-part *Penn Central* test for regulatory takings. *See Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). The object of the economic impact analysis is to determine the economic impact of the regulatory scheme as a whole on the affected parties. In order to determine the economic impact, the overall nature of the scheme must be evaluated, including any exceptions to the regulation. For example, if a zoning regulation or

---

[1] The majority analyzes both ELIHPA and LIHPRHA. *See* Majority Op. at 11. However, only the provisions of LIHPRHA impacted the plaintiffs. Congress enacted ELIHPA on February 5, 1988. ELIHPA was then superseded by LIHPRHA, which was enacted on November 28, 1990, before CCA's predecessor became eligible to prepay its mortgage on May 17, 1991.

permitting scheme provides variances or exceptions, the economic impact of those must be taken into account. *See id.* at 137. Thus we held in *Cienega X*, 503 F.3d at 1282-87, that simply treating LIHPRHA as extending rent control for five years was not accurate. This was because the developer had other options to escape the rent-control regulation, options that we characterized as "offsetting benefits," that is, exceptions to the regulatory obligations. *Id.* The owner could escape the rent controls by selling the property for fair market value or prepaying the mortgage and exiting the program. If an owner wished to prepay and exit the program, the owner was required to first offer the property for sale to purchasers who would pay fair market value to the seller and maintain the property as low-income housing for its remaining useful life. An appraisal process, involving two appraisers (one selected by the Department of Housing and Urban Development ("HUD") and the other by the owner), determined "the fair market value of the housing based on the highest and best use of the property." 12 U.S.C. § 4103(b)(2). Then, HUD would provide financial incentives to the purchasers to assist them in purchasing the property. *Id.* §§ 4110(d), 4111(d). If HUD failed to provide financial assistance or a willing buyer could not be found, owners could prepay their mortgages and exit the program. *Id.* §§ 4113(c)(1)–(3), 4114(a). While this process unfolded, the prepayment restriction preserved the status quo and kept the HUD rent control restrictions in place.[2]

---

[2]    In addition to permitting the owner to escape the regulation, the statute also offered incentives (so-called use agreements) if an owner agreed to maintain the property as low-income housing subject to rent control for its remaining useful life. Congress viewed this as a "fair and reasonable exchange" because the rates of return provided for under these use agreements "compare[d] well to rates of return expected . . . in market rate housing,"

The Supreme Court has repeatedly held that the burden of proof for takings claims lies with the plaintiff. In *Eastern Enterprises v. Apfel*, the Court stated that "a party challenging governmental action as an unconstitutional taking bears a substantial burden." 524 U.S. 498, 523 (1998). The Court also held in *Keystone Bituminous Coalition Ass'n v. DeBenedictis* that there was no taking because the plaintiffs had not satisfied their "heavy" "burden of proving that they [had] been denied [an] economically viable use of [their] property." 480 U.S. 470, 493, 499 (1987).

Under the Supreme Court's decision in *Penn Central*, the economic impact analysis is a critical element of the takings analysis. 438 U.S. at 124. The burden of proof on economic impact, as with other elements of the *Penn Central* test, rests with the claimant, as this court has confirmed in *Cienega X* and other cases. As we said in *Cienega X*, for each of the *Penn Central* factors, "the burden is on the owners." 503 F.3d at 1288. *See also Forest Props., Inc. v. United States*, 177 F.3d 1360, 1367 (Fed. Cir. 1999). Both the Claims Court and the majority agree that the burden of proof on economic impact rests with the plaintiff. Majority Op. at 8 ("The plaintiff must establish economic impact . . . ."); *CCA Assocs.*, 91 Fed. Cl. at 613 ("CCA undoubtedly ha[d] the burden of proof on each of the *Penn Central* factors, including that of economic impact.").

The error of the Claims Court and the majority is in viewing offsetting benefits as not part of the economic

---

taking into account the low risk of the government program. S. Rep. No. 101-316, at 105 (1990).

impact analysis.[3]   In *Cienega X*, we directly held that offsetting benefits are part of the economic impact analysis, not a separate analysis relating to the calculation of just compensation.  503 F.3d at 1283-84.  Simply put, the "offsetting benefits must be accounted for as part of the takings analysis."  *Id.*  at 1283 (citing *Penn Central*, 438 U.S. at 137).  In *Cienega X*, moreover, we held that the question of economic impact had to be determined taking account of the regulatory scheme as a whole.  *Id.* at 1282-83.  We specifically held that the Claims Court had erred "in its failure to consider the offsetting benefits that the statutory scheme afforded which were specifically designed to ameliorate the impact of the prepayment restrictions."  *Id.*  at 1282-83; *see also id.*  at 1283 (distinguishing the statutory framework based on its "amelioration of the restrictions imposed on the existing property").  In assessing economic impact, it was not permissible to treat the statute as though it simply imposed rent control for a five-year period; it was necessary to consider the economic impact of the fact that opportunities existed to eliminate the rent control restrictions. *Id.* at 1283-85.

The Supreme Court has similarly held that the complete nature of a challenged statute must be considered in an economic impact analysis.  For example, in *Penn Central*, the offsetting benefits "undoubtedly mitigate[d] whatever financial burdens the law [had] imposed on

---

[3]     *See* Majority Op. at 8 ("Offsetting benefits, if there are any, must be established by the government to rebut the plaintiff's economic impact case."); *CCA Assocs.*, 91 Fed. Cl. at 613-14 ("Once CCA [had] established the economic impact of the restriction in question, the burden [was] on the government to show that other statutory benefits should offset that impact.").

appellants and, for that reason, are to be taken into account in considering the impact of the regulation." 438 U.S. at 137. In *Connolly v. Pension Benefit Guaranty Corp.*, the Court held that the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), requiring employers to pay into a pension fund, was not on its face a taking because of the lack of serious economic impact. 475 U.S. 211, 225-26, 228 (1986). "[A]s to the severity of the economic impact of the MPPAA, there [was] no doubt that the Act completely deprive[d] an employer of what-ever amount of money it is obligated to pay to fulfill its statutory liability." *Id.* at 225. But there, as here, "there [were] a significant number of provisions in the Act that moderate[d] and mitigate[d] the economic impact of an individual employer's liability." *Id.* at 225-26. Such offsets included "sections of the Act [that] moderate[d] the impact . . . by exempting certain transactions" and other "sections [that] reduce[d] the size of the financial liability in various instances." *Id.* at 226 n.8. These moderating and ameliorating features were required to be taken into account in the economic impact analysis.

Similarly, in *Forest Properties*, 177 F.3d at 1367, we placed the burden of proving the entire economic impact, including costs saved, on the plaintiff. *Forest Properties* involved a tract of land, a portion of which could not be developed as planned due to the denial of a permit. *Id.* at 1366. The plaintiff provided evidence of what the post-development value of the restricted land would be, but did not account for the development costs that the plaintiff would incur to develop the land. *Id.* at 1367. The evi-dence "reflect[ed] the development of the lots following the denial of the permit," but "[did] not necessarily reflect [the] [fair market] value immediately after the permit was denied." *Id.* Accordingly, we held that "Forest had

the burden of proof to establish a regulatory taking, and it failed to carry that burden." *Id.*

Furthermore, this is not a situation where the necessary information regarding offsets was in possession of the government but not the plaintiffs. The plaintiffs were well aware of the scope of the regulatory scheme. Even if this were a situation where the relevant information was in possession of the government but not the plaintiffs, that would suggest merely shifting the burden of production, as we have done in recent government contract cases with respect to avoided costs, while maintaining the ultimate burden of proof on the plaintiffs. We held in those contract cases that "a non-breaching plaintiff bears the burden of persuasion to establish both the costs that it incurred and the costs that it avoided as a result of a breach of contract." *Boston Edison Co. v. United States*, 658 F.3d 1361, 1369 (Fed. Cir. 2011). In such contexts, "the breaching party may be responsible for affirmatively pointing out costs that were avoided," but ultimately "the plaintiff must incorporate them into a plausible model of [] damages." *Id.* (citing *S. Nuclear Operating Co. v. United States*, 637 F.3d 1298, 1304 (Fed. Cir. 2011); *Energy Nw. v. United States*, 641 F.3d 1300, 1307-08 & n.5 (Fed. Cir. 2011)).

In light of the Supreme Court's and our own precedents, there is simply no basis for shifting the burden of proof from the plaintiffs to the government for offsetting benefits or for separating those benefits from the overall impact of the statutory scheme. The majority's sole basis for holding otherwise is a snippet of language in *Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260 (Fed. Cir. 2009), in which the government argued a plaintiff egg producer "benefitted from operating in an environment [created by the regulation] that protected the public from the spread of salmonella" because, without government

action, "the public's confidence in th[e] market would have deteriorated, reducing demand" for eggs. Brief of Defendant-Appellant at 47-48, *Rose Acre*, 559 F.3d 1260 (No. 2007-5169). We rejected this claim, noting that the government had "point[ed] to no economic data in the record to support its assertion." *Rose Acre*, 559 F.3d at 1275. However, *Rose Acre* involved indirect benefits flowing from the solution to the regulatory problem, rather than specific benefits provided to those affected by government regulation which were "designed to ameliorate the impact of [the regulation]." *Cienega X*, 503 F.3d at 1283. It provides no support for the Claims Court's impermissible shifting of the burden of proof concerning the direct impact, or lack of impact, of the regulation itself.

### B  The Failure to Consider Offsetting Benefits as Part of the Economic Impact Analysis

I also disagree with the majority's approval of the Claims Court's decision in another aspect of the economic impact analysis: its characterization of the offsetting benefits as "speculative." *See CCA Assocs.*, 91 Fed. Cl. at 618. While I agree with the majority that an 18% economic impact (not considering offsetting benefits) is not sufficient to establish a taking, the majority is entirely off base in suggesting that the impact here was in the 18% range. This analysis entirely ignores offsetting benefits. In *Cienega X*, we held that these offsetting benefits must be taken into account, *id.* at 1283-84, and even in this case, the record establishes that the economic impact was far less than the 18% figure assumed by the majority. This is so regardless of whether the burden of proof on economic impact rested with the plaintiffs or the government.

The parties here agreed that the economic impact would be measured based on the diminution in value of CCA's property due to the rent control (i.e., the difference between what a buyer would have paid in May 1991 for Chateau Cleary unencumbered by HUD restrictions and what a buyer would have paid in May 1991 encumbered by the HUD restrictions). The parties stipulated that the economic impact without considering offsetting benefits was 18%. CCA introduced no evidence as to the impact of offsetting benefits, i.e., the ability to sell the property or to otherwise escape future rent control. Only the government supplemented the record to provide further evidence of the economic impact of offsetting benefits. The government submitted expert testimony that the potential to sell the property for fair market value, or to exit the program and raise rents to market rates, necessarily would affect the value of the property. The government's expert report adjusted the stipulated value calculation to account for offsetting benefits, concluding that continuing the restrictions reduced the value of the property by only 5%.

However, the Claims Court held that offsetting benefits could only be taken into account if there was "reasonable certainty" that a sale would have occurred, and that such a reasonable certainty did not exist.[4] *CCA Assocs.*, 91 Fed. Cl. at 618. The possibility that CCA could exit the program was therefore "speculative." *Id.* The finding underlying this conclusion is based on a misunderstand-

---

[4]    Similarly, the Claims Court held that "to adopt [the government expert's] estimate [of a 5% economic impact], this court must find that it was probable that CCA could have pursued a sale and have successfully sold the property under ELIHPA if it had sought to do so." *CCA Assocs.*, 91 Fed. Cl. at 614.

ing of the relevant statutes and, insofar as it represents a finding of fact, is clearly erroneous.[5]   But more importantly, the Claims Court's approach reflects a fundamental misunderstanding of the valuation process, one that CCA continues to urge on appeal.   CCA argued that its "position throughout has been that the value of these statutory 'options' cannot be quantified because, *inter alia*, CCA never availed itself of any options, and therefore to quantify the 'value' of the options would be an

---

[5]   The Claims Court concluded that it was uncertain whether a sale would have occurred because there was no notice of a sale option under ELIHPA, no reasonable certainty that CCA could have found a willing buyer, and a sale under LIHPRHA would have taken so much time that HUD funding would have no longer been available. The first of these findings is legally erroneous. As noted above, the ELIHPA statute and regulations specifically mentioned the possibility of a sale, and CCA itself filed a notice of intent under ELIHPA which mentioned that it might pursue a sale of the property. The second and third findings are immaterial. If a buyer could not be found or funding was not available, CCA could have exited the program. 12 U.S.C. § 4114(a). Moreover, the second and third findings are clearly erroneous. The owner of four separate properties in the New Orleans area found a buyer for his properties. Indeed, the government's expert testified that he was unaware of any owners who were unable to find willing purchasers. And in November 1990, CCA itself was approached (through an executive of the company servicing CCA's mortgage) by a non-profit buyer that was potentially interested in purchasing Chateau Cleary. The evidence established that the LIHPRHA sale process could be completed in two and a half years or less, meaning that a LIHPRHA sale begun in April 1992 could have been completed before 1995 when HUD began to encounter problems funding sales. And the funding problems might not have been fatal to a sale even after 1995, as four properties in the New Orleans area were still sold after the funding problems arose.

exercise in speculation."   Plaintiff-Cross Appellant's Br. 51.  The question is not whether CCA would have availed itself of the offsetting benefits or whether a sale would have occurred.  The proper analysis is whether a prospective purchaser in May 1991 would have attributed value to the opportunities offered by the statutory scheme to exit the program and escape the rent control obligations. Determining market value involves consideration of "[a]ll facts which the owner would properly and naturally press upon the attention of a buyer with whom he is negotiating a sale, as well as those facts which would naturally influence a person of ordinary prudence desiring to purchase the property."   4 *Nichols on Eminent Domain* § 12.02 (2010).  "[C]ourt[s] must consider any aspect of the property that could have affected the amount a reasonable buyer would be willing to pay."  *A.A. Profiles, Inc. v. City of Fort Lauderdale*, 253 F.3d 576, 585 (11th Cir. 2001).

As discussed above, cases such as *Penn Central* and *Connolly* require that ameliorating sections in the statutory scheme be taken into account in the economic impact analysis.  The Supreme Court has also recognized that a valuation analysis must take into account other possibilities that could affect market value even when they are not certain to occur.  In *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473 (1973), the government condemned a lessee's property interest (including improvements the lessee had made to the land), and the Ninth Circuit held that it was not necessary to take into account the possibility that the lease might have been renewed because that would be "speculati[ve]."  The Supreme Court rejected this argument, holding that "[b]y failing to . . . tak[e] into account the possibility that the lease might be renewed as well as the possibility that it might not [the lower court] failed to recognize what a willing buyer would have paid for the improvements."  *Id.*

at 474. The Court explained that failing to account for this possibility "is not how the market would have valued [the] improvements" because a buyer would not have assumed that "there [was] no possibility of" a lease renewal. *Id.* at 478.

Similarly, in *Great Northern Nekoosa Corp. v. United States*, 711 F.2d 473 (1st Cir. 1983), the First Circuit reiterated this principle in the context of a valuation for tax purposes. The court held that the federal government's designation of a piece of plaintiff's property as a "possible part" of a national wildlife system had to be considered in determining the property's market value even though the parcel would only become part of the system if the state agreed. *Id.* at 475. Though such an event was "uncertain," the possibility "substantially reduced its market value because it would necessarily affect the price which would be paid by a willing seller." *Id.*[6] A leading appraisal guide also confirms that the "right to sell an interest" in one's property is an "individual right" in the property that "has some potential value." Appraisal Institute, *The Appraisal of Real Estate* 112 (13th ed. 2008).

In keeping with this standard approach, the government's appraisal expert, Dr. Dickey, testified that the possibility of a sale, or the possibility of prepayment if a sale did not occur, "provided potential avenues to realize at least some value in the property" and that "accounting

---

[6] *See also State Highway Comm'n v. Stockhoff*, 519 P.2d 1281, 1284 (Or. Ct. App. 1974) (noting that the possibility Oregon might exercise its contractual option to build a road over plaintiff's right of way that would decrease the value of plaintiff's property would affect market value because "a prospective buyer would likely be influenced by the existence of the option in determining the purchase price").

for these options would lower the measure of economic impact." Transcript of Record at 1631, *CCA Assocs. v. United States*, 75 Fed. Cl. 170 (2007) (No. 98-CV-334) ("Transcript"). In fact, CCA itself filed a notice of intent under ELIHPA to preserve these very options.

These opportunities were, moreover, hardly remote possibilities. Sales of rent controlled properties occurred nationwide under LIHPRHA, including four in the New Orleans area where CCA's property was located, and the government's expert testified that he was unaware of any instance where an owner could not find a willing purchaser. Hundreds of such transactions nationwide were completed. The government's expert also testified that the process could be commenced a year before the prepayment date and was usually completed in eighteen to twenty-four months. *See* 12 U.S.C. § 4101 (2000). The Claims Court here acknowledged that it was "possible" that CCA could have "found a buyer and obtained the necessary approval from HUD to complete a sale" before HOPE lifted the prepayment restrictions. *CCA Assocs.*, 91 Fed. Cl. at 618.

Even in the unlikely event that a buyer could not be found, LIHPRHA allowed owners to exit the program if they could not consummate a sale because they did not find a willing purchaser or did not receive HUD funding for the sale. 12 U.S.C. § 4114(a)(1)–(2). Owners who exited the program were allowed to raise their rents to market rates unless their project was located in a "low vacancy area" (defined by HUD as a less than 3% vacancy rate), in which case owners could not raise rates on existing tenants for three years. 12 U.S.C. § 4113(c)(1)–(3). Even if the three-year grace period applied here (a matter in dispute), it applied only to tenants who occupied their apartments when the owner filed his notice of intent. 12

U.S.C. § 4113(c)(1).  Owners could raise the rents on other units.

Under standard valuation theory, it is particularly inappropriate to focus (as the Claims Court did here) on whether CCA itself could have sold its property for market value.  "To establish market value, it is not necessary to point out any designated person able and willing to buy the property at the price alleged (or at any price), or to show that the owner is in fact willing, or even has the legal capacity, to sell it."  4 *Nichols on Eminent Domain* § 12.02.  "[T]he application of this concept [of market value] involves, at best, a guess by informed persons." *United States v. Miller*, 317 U.S. 369, 375 (1943).  Appraisals are "based on market comparisons" to comparable properties.  Appraisal Institute, *supra*, at 297, 301–02, 377.  Therefore, the fact that numerous other comparable owners in the same program took advantage of the statute's opportunities and consummated sales is clearly relevant and indicates that the benefits had value.  Significantly, the Claims Court made no finding that the possibility of a sale or other option was without value.

The government's expert report showed that the possibility of a sale of the property would have resulted in only a 5% diminution in value from the LIHPRHA rent control.  The report assumed that a sale could have occurred by November 1992 and the fair market sale would have effectively allowed CCA to realize market-rate income for the period following November 1992.

Whether or not the 5% figure represented the definitive measure of the economic impact in this case, the evidence, at a minimum, indicates that the value of the benefits was substantial.  The economic impact was far less severe than the 18% figure.

### II  The Character of the Government Action

Finally, I dissent from one other aspect of the majority's decision—its approval of the Claims Court's prior analysis as to the character of the government action, which it held to be "analogous to a physical invasion" rather than a mere form of transitional rent control. *CCA Assocs.*, 75 Fed. Cl. at 190.  Although in *Cienega Gardens v. United States* ("*Cienega VIII*"), 331 F.3d 1319 (Fed. Cir. 2003), a panel of this court determined the government action had the character of a taking because it was akin to a physical invasion, *id.* at 1338, the panel also recognized that a different result was possible based on different arguments and a different record, *id.* at 1355.  Here, in contrast to *Cienega VIII*, the government urged that LIHPRHA imposed a form of rent control, and therefore, a form of permissible government action.  Specifically, the government argued that the "Preservation Statutes merely limited the owner's ability to unilaterally raise tenant rents," and "[r]ent control statutes are not generally considered to have the character of a taking."  Defendant-Appellant's Br. at 38-39.

In its post-trial brief to the Claims Court, the government similarly urged that "the character of the Preservation Statutes [was] akin to standard rent control statutes" because "the statutes merely limited the owner's ability to raise rents."  Defendant's Post-Trial Memorandum of Contentions of Fact and Law at 47, *CCA Assocs.*, 91 Fed. Cl. 580 (No. 97-CV-334).  CCA also viewed the preservation statutes as primarily imposing rent control, urging that the preservation statutes effected a taking by limiting CCA's ability to charge market rents.[7]  CCA

---

7      *See* Plaintiff's Pre-Trial Memorandum of Contentions of Fact and Law at 1, *CCA Assocs.*, 75 Fed. Cl. 170 (No. 97-CV-334) (arguing that "[t]he government effected

argued that LIHPRHA curtailed its "ability to prepay the mortgage . . . and thereby to operate Chateau Cleary as a market-rate property." Plaintiff's Post-Trial Memorandum of Contentions of Fact and Law at 18, *CCA Assocs.*, 91 Fed. Cl. 580 (No. 97-CV-334). At trial, CCA's managing partner testified that the regulatory agreement allowed HUD to "control the rents," which would have been higher if CCA had been permitted to prepay in May 1991, allowing for greater income and cash flow. J.A. 2. He complained that CCA could have charged "at least 20, 25 percent higher" rents. J.A. 4. Similarly, in its brief to this court, CCA stressed that it had to charge "HUD-approved" rents and that it "lost the right to rent units at market rates." Plaintiff-Cross Appellant's Br. at 4, 20. Commentators have agreed that LIHPRHA imposed "a type of rent regulation." [8]

The Congressional justification for the continuing rent control after the prepayment date was clear enough. As the first prepayment dates grew near during the 1980s, Congress grew concerned that project owners would eliminate rent control by exiting the program, severely depleting the supply of affordable housing units. Congress feared the loss of over 330,000 units due to mortgage prepayments and the elimination of rent control.

---

a regulatory taking of CCA's right to exist HUD's low-income housing program and to convert its property to conventional market rate rentals").

[8]     Robert Meltz, et. al., The Takings Issue: Constitutional Limits on Land Use Control and Environmental Regulation 300 (1999); see also Daniel L. Siegel, et. al., Temporary Takings: Settled Principles and Unresolved Questions, 11 Vt. J. Envtl. L. 479, 501 n.176 (2010) (describing preservation statutes as "provisions which restricted the ability of [project owners] from . . . avoiding rent control requirements").

Congress stressed that absent government action, tenants whose landlords prepaid their mortgages would be forced either to "stay in [the] project and pay substantial rent increases or begin a search for housing in markets where comparable affordable housing does not exist." S. Rep. No. 101-316, at 103 (1990). Congress feared "that elderly and low income tenants [would] have no alternative but to be thrown in the street without further action" by the government to continue rent control. H. Rep. No. 100-122, at 48 (1987) (Conf. Rep.), *reprinted in* 1987 U.S.C.C.A.N. 3317, 3370. The statute "protected low-income tenants from evictions or sharp increases in rent." S. Rep. No. 101-316, at 98.

The "substantial public purpose" of a statute weighs against the finding of a taking. *Penn Central*, 438 U.S. at 127. As this court said in *Rose Acre*, 559 F.3d at 1281, "[t]here is little doubt that it is appropriate to consider the harm-preventing purpose of a regulation in the context of the character prong." There is no doubt that rent control has a significant harm-preventing purpose. In *Block v. Hirsch*, 256 U.S. 135, 154, 156 (1921), the Supreme Court recognized that "[h]ousing is a necessary of life," and that rent-control statutes are designed to prevent conditions "dangerous to the public health."

Rent control and rent stabilization laws have been almost invariably held to represent legitimate government acts and not to support either physical or regulatory takings challenges. *See, e.g.*, *Yee v. City of Escondido*, 503 U.S. 519 (1992); *Bowles v. Willingham*, 321 U.S. 503 (1944); *Block*, 256 U.S. 135; *Guggenheim v. City of Goleta*, 638 F.3d 1111 (9th Cir. 2010) (en banc); *Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal*, 83 F.3d 45 (2d Cir. 1996); *Kavanau v. Santa Monica Rent Control Bd.*, 941 P.2d 851 (Cal. 1997); *Rent Stabilization Ass'n v. Higgins*, 630 N.E.2d 626 (N.Y. 1993). The Su-

preme Court in *Yee* recognized the legitimacy of rent control and expressed concern with such regulations only if the statute "compel[s] a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." 503 U.S. at 528. However, this is not such a case. LIHPRHA only restricted the landlord's rights for approximately five years, and owners had opportunities to exit the program through sale or prepayment before that.[9]

CCA does not contest that rent control statutes have a vital public purpose, and that it retained the ability to select tenants within the eligible group of low and moderate income individuals, to evict tenants for cause, and even to leave the units vacant. But, CCA contends that the LIHPRHA rent control scheme is distinguishable from the type of rent control approved in other cases because it (1) restricted CCA's ability to evict tenants and prevented CCA from choosing tenants who did not fit HUD's income requirements, (2) prevented CCA from converting the property to another use, and (3) prevented CCA from selling the property without HUD approval. Rent control schemes that impose restrictions, including some or all of these features, have frequently been upheld.

First, many rent control regimes restrict a landlord's ability to evict tenants or to select tenants but have been held not to result in takings. *See, e.g.*, *Yee*, 503 U.S. at 524–27 (upholding a local rent-control ordinance that

---

[9] In rejecting the *Cienega* plaintiffs' physical takings claims, we recognized that *Yee* was "controlling" because "the effect of the prepayment restrictions . . . [was] merely to enhance an existing tenant's possessory interest" rather than authorize a permanent occupation. *Cienega Gardens v. United States* ("*Cienega VI*"), 265 F.3d 1237, 1248 (Fed. Cir. 2001) (quoting *Cienega Gardens v. United States*, 33 Fed. Cl. 196, 217 (1995)).

prevented owners of mobile home parks from evicting their tenants and from selecting their tenants); *Block*, 256 U.S. at 154 (upholding a District of Columbia rent control statute that, inter alia, allowed a tenant to remain in possession after expiration of his lease as long as he continued to pay the rent fixed by a government commission); *Troy Ltd. v. Renna*, 727 F.2d 287, 290–91, 301–02 (3rd Cir. 1984) (sustaining a New Jersey statute that prevented landlords who converted an apartment building to a condominium from evicting senior citizens and disabled tenants for forty years unless, inter alia, the tenants' income level was above a certain threshold).

Second, courts have upheld against takings challenges regulatory schemes that put severe restrictions on a property owner's ability to convert rent regulated properties to new uses, such as condominiums. In fact, the District of Columbia Circuit has recognized that "takings clause challenges in th[e] context [of restrictions on conversion of rental property] have not fared well." *Silverman v. Barry*, 727 F.2d 1121, 1126 (D.C. Cir. 1984); *see Fresh Pond Shopping Ctr., Inc. v. Callahan*, 464 U.S. 875 (1983) (statute preventing removal of a rent controlled property from the rental housing market absent a permit from the rent control board); *Gilbert v. City of Cambridge*, 932 F.2d 51, 54, 56–57 (1st Cir. 1991) (upholding ordinance which "prohibit[ed] an owner from 'removing' any [housing units offered for rent before August 1979] from the rental market without first obtaining a permit from the Rent Control Board"); *Nash v. City of Santa Monica*, 688 P.2d 894, 896, 898 (Cal. 1984) (upholding a rent control law that "prohibit[ed] removal of rental units from the housing market by conversion or demolition absent a removal permit"); *see also Sadowsky v. City of New York*, 732 F.2d 312, 318-19 (2d Cir. 1984)

(rejecting regulatory takings claim against ordinance restricting conversion).

Third, the fact that CCA could sell its property only to purchasers who promised to maintain the rent restrictions is a feature of many rent-control provisions and has not been held to create a taking. *See Fresh Pond*, 464 U.S. 875 (statute requiring any purchasers of the rent controlled property to abide by the rent control restrictions); *Silverman v. Barry*, 845 F.2d 1072, 1077 (D.C. Cir. 1988) (upholding conversion law requiring that owners offer to sell their rent-controlled properties to tenant cooperatives before other prospective purchasers).

Far from imposing unusual restrictions, the LIHPRHA scheme, as discussed above, was less intrusive than other rent control regimes by allowing owners to sell their property and to exit the program.

LIHPRHA did not place the burdens solely on the owners. Rather, there was a substantial sharing of the burden between the program owners and the general taxpayers at large, a feature that cuts against takings. *See Penn Central*, 438 U.S. at 148 (describing the design of the Takings Clause "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole" (internal quotation marks omitted)). From the outset, the section 221(d)(3) program involved a transfer of substantial benefits from taxpayers as a whole to the projects owners. Government subsidies provided the owners with below-market interest rates, and the government also insured the owners' nonrecourse loans and provided substantial tax breaks. Under LIHPRHA, HUD expended federal funds to entice non-profit organizations or other buyers to purchase owners' properties at fair market value and to provide incentives for owners to

enter into use agreements.  Congress authorized HUD to spend $638 million on these incentives during the 1993 fiscal year alone.   12 U.S.C. § 4124(a).  Through the end of 2006, the federal government spent about $1.2 billion to preserve 751 projects containing about 19,000 units, constituting an outlay of approximately $19,000 per unit. Maggie McCarty, *Congressional Research Service Report: Preservation of HUD-Assisted Housing* 23 (2010), *available                                                         at* http://www.preserveoregonhousing.org/CRS_Pres_Report. pdf. In fact, Congress wanted to end LIHPRHA's prepayment restrictions because it viewed the program as too "costly" and the benefits as providing a "windfall" for project owners.  S. Rep. No. 104-140, at 37 (1995).

For these reasons, I conclude that the character of the government action does not support CCA's takings claim.[10]

---

[10]   I also note my disagreement with the majority opinion to the extent that it seeks to cast doubt on our decision in *Cienega Gardens v. United States* ("*Cienega IV*"), 194 F.3d 1231 (Fed. Cir. 1998), rejecting a similar contract claim.